UNITED STATES of America, Appellee,

v.

William D. HICKS,
Defendant, Appellant.

No. 87–2117.

United States Court of Appeals,
First Circuit.

Heard May 3, 1988.
Decided May 27, 1988.

Richard B. McNamara with whom Wiggin & Nourie, Manchester, N.H., was on brief, for appellant.

Sara M. Lord, Public Integrity Section, Crim. Div., Dept. of Justice, with whom William F. Weld, Asst. Atty. Gen., Washington, D.C., Crim. Div., and Richard V. Wiebusch, U.S. Atty., Manchester, N.H., were on brief, for appellee.

Before COFFIN and TORRUELLA, Circuit Judges, and FUSTE,* District Judge.

COFFIN, Circuit Judge.

Appellant William Hicks was convicted in the United States District Court for the district of New Hampshire of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951. The gist of the government's case was that defendant attempted to obtain

* Of the District of Puerto Rico, sitting by designa- tion.

between $5000 and $10,000 from one James R. Proko in exchange for a guarantee that he would secure the approval by the Salem Town Planning Board of Proko's application for a Honda car dealership. Following a five-day trial, the jury returned a verdict of guilty. We affirm the conviction.

### I.

James Proko and members of his family have owned and operated an automobile dealership in Nashua, New Hampshire for over thirty years. In late 1984, the Prokos received permission from Honda to establish a Honda dealership in Salem. They planned to build the dealership on land they had purchased several years earlier. The Prokos' plan for the property was filed with the Salem planning director, and a preliminary hearing was scheduled for May 14, 1985. At that meeting, the Planning Board raised several minor issues and scheduled a final hearing on the plan for May 28th.

The day of the final hearing, Hicks made the first in a series of contacts with James Proko, following a telephone call to James' brother Peter. Peter Proko testified that Hicks described himself as the "Godfather of Salem," and had conveyed that things were done differently in Salem than in Nashua. James Proko testified that Hicks repeated this warning to him. Proko went to Hicks' house later that day, where, according to Proko, Hicks bragged that he "controlled" votes on the Planning Board. Proko was advised to make an "investment" of $10,000 to see that the plan would be approved. Hicks explained, as he would repeatedly over the next two weeks, that there were many ways in which members of the board could, if Proko refused to play by the local rules, delay and obstruct approval of the plan indefinitely. Proko told Hicks that he would get back to him on the offer. Minutes after Proko left Hicks' residence, a call was made from Hicks' phone to M.I.T. Lincoln Labs, where one Charles T. McMahon worked.[1] McMahon was a

Salem Planning Board member, as well as Hicks' close friend and former employee.

Proko then went to the police, and subsequently the FBI, with the story of the alleged extortion attempt. Under immediate time constraints, Proko requested that the Board postpone the hearing. It was rescheduled for June 11, 1985. The following day, Proko agreed to cooperate with the FBI. Numerous conversations between him and Hicks in the weeks and months that followed were secretly recorded and introduced at trial.

Negotiations between Hicks and Proko took place frequently during the following two weeks. Hicks was circumspect in his dealings, and never again explicitly invoked the requested pay-off. The understanding between the parties could, however, readily be deduced from some obvious inferences gleaned from the conversations.

Proko continued to resist Hicks' overtures, frequently yet unsuccessfully requesting a meeting with those board members with whom Hicks was allegedly in cahoots. On various occasions during this period, Hicks and McMahon had telephone conversations, often immediately preceding or following Hicks' talks with Proko. On the day before the board meeting, Hicks seemed to cut his price in half, imploring Proko to "purchase" a used car from Hicks for $5000. Proko continued to insist on a meeting with the principals. Immediately following this conversation, another call was made between Hicks and McMahon. After consulting with the FBI, Proko informed Hicks that he was refusing to go along with the deal. This was followed by several more calls between Hicks and McMahon during the next day and a half preceding the board meeting.

About twenty or thirty minutes before the board meeting, the members met informally for coffee. Ross Moldoff, the town Planning Director, testified that he overheard McMahon asking a fellow board member, George Salisbury, to obstruct approval of Proko's plan:

---

**1.** This and other calls between Hicks and McMahon were reflected in phone company logs of long-distance calls.

I heard Mr. McMahon say to Mr. Salisbury that he wanted to not take action on this plan tonight. He wanted George to help him find something or help him stop the approval of the plan that evening. He didn't want the plan approved that evening.

App. at 825.

Another board member testified that at the meeting he oversaw a note passed from McMahon to Salisbury that said: "I need your help in stopping the Proko plan. I believe it's within two thousand feet of another used car lot." App. at 853. Just prior to the vote on the plan, McMahon raised the issue of a town ordinance barring the placement of used car lots within 2000 feet of one another. There was another used car lot less than 2000 feet from Proko's property, but outside the city line. After discussion, the Board decided to seek a formal ruling on the ordinance from town counsel. McMahon then moved for approval conditioned on a favorable ruling from counsel. This motion was unanimously approved.

The next day, Hicks once again contacted McMahon by phone, and McMahon was observed leaving Hicks' house later that afternoon.

Three days later, the town counsel issued a formal ruling that the ordinance was inapplicable. Proko's plan was approved.

Defendant was convicted of attempted extortion. Neither side called McMahon or Salisbury as a witness at trial.

## II.

Appellant's primary complaint is that Moldoff should not have been able to testify regarding McMahon's alleged entreaty to Salisbury, because such testimony constituted hearsay. But this argument is groundless, because there is no hearsay problem here at all.

McMahon's statement was not admitted for the truth of anything asserted. Indeed, there could be no "truth" or falsity in a request for assistance. The statement thus was not hearsay under Federal Rule of Evidence 801(c). As the drafters of the Rules noted, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Rule 801(c), Notes of Advisory Committee on Proposed Rules. McMahon's statement was offered not to show what he wanted (although it did include an assertion to that effect), but solely to show that he had solicited help in stopping the plan; this in turn would be probative of whether the defendant had enlisted McMahon in an attempt to make good on the extortion threat. As such, the statement was a verbal act, and not hearsay at all. *See United States v. Figueroa*, 818 F.2d 1020, 1026–27 (1st Cir.1987); *United States v. Cintolo*, 818 F.2d 980, 998 n. 8 (1st Cir.1987); *United States v. Southard*, 700 F.2d 1, 13 (1st Cir.1983). We have elsewhere noted that statements made incident to planning board meetings indicating hostility to approval of a plan may be offered to demonstrate that the proscribed behavior actually occurred, and therefore are not subject to hearsay treatment. *See Heritage Homes of Attleboro v. Seekonk Water Dist.*, 648 F.2d 761, 763 (1st Cir. 1981). *See also United States v. Conn*, 769 F.2d 420, 422 (7th Cir.1985) (similar issue in Hobbs Act setting). Here, there is no need to evaluate McMahon's credibility. The only issue was whether McMahon actually said what he did, and as to that, Moldoff was available for cross-examination.

## III.

Appellant next contends that he should have been afforded access to McMahon's and Salisbury's grand jury testimony, for its possible exculpatory value. Defendant was informed of the role of McMahon and Salisbury in the allegations, and was also told that the government was not going to call them as witnesses.

We have not had the occasion to pass upon the question of whether and under what circumstances the grand jury testimony of a *non*-witness (that is, a potential witness who is not called to testify by the government) should be available to a defendant pursuant to *Brady v. Maryland*,

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, in a long line of cases, the Second Circuit has ruled that, where the defense is aware of the grand jury witness and has access to interview that witness and have the witness testify at trial, the government need not disclose the details of the witness' grand jury testimony. *See United States v. LeRoy,* 687 F.2d 610, 618–19 (2d Cir.1982); *United States v. Natale,* 526 F.2d 1160, 1170–71 (2d Cir. 1975); *United States v. Stewart,* 513 F.2d 957, 960 (2d Cir.1975); *United States v. Ruggiero,* 472 F.2d 599, 603–05 (2d Cir. 1973). *Accord Gollaher v. United States,* 419 F.2d 520, 527 (9th Cir.1969). *See also Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir. 1982) (government has no *Brady* burden when facts are readily available to a diligent defender).

We concur with the Second Circuit in this regard. The statement of the potential witness *not* called by the government is in no meaningful sense "suppressed." The defense has access to interview the witness to discover exculpatory information. Indeed, the fact that the government is not calling the witness will often be a tip-off that the witness' testimony is potentially helpful to the defendant. By knowing who the witness is, the defendant is "on notice of the essential facts required to enable him to take advantage of [the] exculpatory testimony...." *Ruggiero,* 472 F.2d at 604. Most significantly, in the absence of the declarant, the contested grand jury testimony is inadmissible as hearsay as long as the witness *can* be subpoenaed to testify. *Id.* at 604–05.

If the defendant for whatever reason cannot gain access to interview or subpoena the witness, then the witness' grand jury testimony becomes subject to *Brady* rules. Similarly, if the defendant does call the witness at trial, and the witness' trial testimony could be refreshed or impeached by the grand jury testimony, the defendant should have access to the earlier statements. *See Ruggiero,* 472 F.2d at 605.

■ In this case, the defendant knew that McMahon and Salisbury had testified before the grand jury, and knew that their testimony could very well assist the defense. The court inquired to make certain that the defendant could interview the witnesses, and defense counsel admitted that he had interviewed Mr. McMahon. He did not indicate that Mr. Salisbury had been unavailable for interview. Defendant cannot now be heard to complain about lack of access to helpful evidence, when it appears that he had that evidence at his disposal and chose, for whatever reason, not to use it at trial.[2]

## IV.

■ Appellant's final complaint is that the court failed to instruct the jury that guilt could only be found if the inferences from the circumstantial evidence "cannot be reconciled with any rational conclusion of innocence." Hicks requested that such a charge be given, and that the jury be told that where the circumstantial evidence is susceptible to two reasonable inferences, the inference consistent with innocence must be accepted. This contention need not detain us long. It has been rejected unequivocally by this court many times in the past. *See, e.g., United States v. Santiago,* 828 F.2d 866, 870 (1st Cir.1987); *United States v. Rivera Rodriguez,* 808 F.2d 886, 890 (1st Cir.1986); *United States v.*

---

**2.** At oral argument, counsel for appellant focused on yet another alleged *Brady* violation, relating to the government's failure to make available before trial a 302 report (an interview report) of an FBI agent who later testified at trial. Appellant contends that that 302 report related statements of Mr. Proko that could have been used to impeach Proko's testimony at trial had defense counsel been aware of the report at an earlier time. This argument was not briefed to us as a ground for challenging the judgment, but was instead merely mentioned in passing in defendant's summary of the case at the beginning of his brief. We question whether such a cursory treatment suffices as a preservation of the argument for appeal. The government's response was, appropriately, equally perfunctory. We have in effect been denied full briefing on the issue. Having studied the record, however, we cannot say in any event that the alleged inconsistencies between Proko's testimony and his previous statements (as recorded by the agent) rise to the level of materiality. If the defense thought otherwise, it was free to recall Proko to the stand to explain any divergences. Any possible error was, therefore, harmless.

*Francomano,* 554 F.2d 483, 486 (1st Cir. 1977); *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.1964). "[T]he government need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt." *Rivera Rodriguez,* 808 F.2d at 890.

## V.

Having considered and rejected each of appellant's contentions, the judgment of conviction is *affirmed.*