Irish v. SSA                              CV-95-315-B    02/27/96

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


John C. Irish

     v.                                    Civil No. 95-315-B

Shirley S. Chater, Commissioner
Social Security Administration



**O R D E R**

John Irish appeals the Commissioner's decision denying him supplemental security income and disability insurance benefits. He argues that the Administrative Law Judge ("ALJ") erred at step three of the sequential analysis by finding that his alleged mental impairment does not qualify as a listed impairment under applicable regulations. He also contends that substantial evidence is lacking to support the ALJ's conclusion at step five that despite the combination of his mental and physical impairments, he is able to perform work as a cleaner and that the cleaner job, described by the vocational expert, exists in significant numbers in the national economy. For the reasons that follow, I affirm the Commissioner's decision.

# I. <u>BACKGROUND</u>[1]

John Irish alleges an inability to work since May 3, 1989, due to a condition that prevents any repetitive or strenuous use of his left hand. He contends that the impairment makes him totally disabled because he is left-handed. In addition, Irish argued and presented evidence at the hearing that he is impaired by a mental condition of depression and attention deficit hyperactivity disorder ("ADHD").

At the time of the hearing in September 1994, Irish was thirty-eight years old. He had a high school education plus one and a half years of vocational college training as an emergency medical technician. His prior work experience included a job as an equipment assembler, an automobile mechanic, and as an emergency medical technician.

The medical records show that Irish was examined by Dr. Edward King, an orthopedist, on March 3, 1988, for treatment of left elbow pain. Dr. King diagnosed left elbow lateral epicondylitis (an inflammation in the elbow) and stated that

---

[1] Unless otherwise indicated, the facts are taken from the stipulated facts filed jointly by the parties in response to the court's order.

Irish was disabled "from activity involving significant lifting or forceful use of his left arm." After some improvement, his symptoms returned and a "left elbow lateral epicondylectomy extensor release" was performed in September 1988. Once again, Irish initially experienced good improvement, returning to work in February 1989, but his symptoms recurred. An examination in April 1989 showed a good range of motion and strength in his left arm but tests detected carpal tunnel syndrome. His condition remained constant through the beginning of September 1989.

On September 15, 1989, he underwent an "ulnar neurolysis" (release of a nerve sheath in the left forearm by cutting it longitudinally) and left carpal tunnel syndrome release. He progressed well and by the end of October, Dr. King stated that he could return to light activity that did not require vigorous use of his left hand or arm. However, by January 1990, Irish was experiencing pain and tingling sensations in his left wrist. Dr. King diagnosed "ulnar neuritis" and recommended that Irish begin a fitness program for his arm. His condition remained the same through September 1990 when Dr. King told Irish that he could engage in activities as tolerated but should avoid prolonged repetitive use of his left arm.

3

In November 1990, Dr. King made a report of medical findings including an assessment of Irish's functional ability for Irish's application for benefits from the state. Dr. King indicated that Irish had full ability to stand, sit, walk, kneel, bend from the waist, climb, use his right arm, and operate a car. He also determined that Irish could occasionally lift up to fifteen pounds, push, pull, and lift over his shoulder with his left arm.

Irish returned for examination in February 1991 complaining of arm aches. Dr. King found tenderness at the "hook of hamate," apparently in the left wrist region, and recommended that Irish tolerate the situation or wear a splint. Irish continued to complain of pain through August 1991 when a bone scan returned normal results. In September, Dr. King performed a "left wrist ulna and median neurolysis and excision hook of hamate." The medical notes show that Irish progressed well and by December was volunteering at New Hampshire's public television station. During the spring 1992, the medical record notes "overall improvement" since the procedure in September, but also "some chronic aching, cold sensitivity and weakness" and "persistent pain and swelling" in his left arm. In June, Irish reported sharp "zingers" in his fingers if he kept his wrist fixed in one position such as driving or holding bicycle handlebars. Dr. King

4

recommended that he avoid maintaining pressure on his palm.

In August 1992, Dr. King completed another report of medical findings with an assessment of Irish's functional ability for the New Hampshire Department of Health and Human Services. His findings remained the same as in November 1990 noting restrictions only as to the use of his left arm.

By November 1992,[2] Irish's symptoms had again increased. The medical record contains reports of severe left elbow pain and that Irish's left hand and forearm were bluish and cooler than his right arm. His condition was diagnosed as "vasospasm," or contraction of the blood vessels, possibly related to recurrent ulnar neuritis, his previous surgery, or a reaction to exposure to cold similar to Raynaud's syndrome. Irish was fitted with a stockinette for his arm and given a prescription for medication. His condition had again improved by his examination in December, and Dr. King recommended activity as tolerated.

In January 1993, Irish was examined by Mary E. Miles, a registered occupational therapist,[3] for an independent medical

---

[2] The stipulated facts have erroneously reported this examination in November 1991.

[3] Although the stipulated facts states that the examination was conducted by Dr. Kenneth S. O'Neill, the medical report shows

5

evaluation at the request of his worker's compensation carrier. Ms. Miles found that Irish's grip strength was above normal on the right and moderately reduced on the left. She found that he performed with a reasonable maximum effort. She noted slight limitations in his range of motion in his left wrist and fingers. She found normal strength in his right arm and good strength in his left arm with mild complaints of discomfort. She also noted positive test results for carpal tunnel syndrome. In summary, her opinion was that Irish had a light to moderate work capacity limited by a need to refrain from repetitive use of his left arm and from some uses of his left hand.

Also in January 1993, non-examining state agency doctor, Dr. Homer Lawrence, did an assessment of Irish's residual functional capacity ("RFC") based on his medical records. He found that despite Irish's left arm impairments, he could lift up to twenty pounds occasionally and ten pounds frequently, and he could sit, stand, and walk for up to six hours per day. The only restrictions Dr. Lawrence noted were Irish's limited ability to handle, finger, and reach in all directions. Upon review in July, Dr. Lawrence's RFC was modified to show a limitation only

that Ms. Miles conducted the examination and her report was reviewed and signed by Dr. O'Neill.

to handle and finger, but was otherwise affirmed.

Dr. King's progress notes in March 1994 in response to a call about Irish's disability status for tax purposes show that he "could not state that [Irish] was totally and permanently disabled."  In a letter to the Social Security Administration in April, Dr. King described Irish as having diminished grip and pinch strength in his left hand and considerable functional impairment of his left arm.  Dr. King gave his opinion that Irish could use his arm for short periods of light duty work but was not then employable in his previous occupations.  His medical assessment of Irish's physical abilities, also done in April, stated that Irish could occasionally lift or carry up to fifteen pounds and was limited only by his left arm.  Further progress notes by Dr. King in July report that Irish continued to complain of pain in his left elbow that was again diagnosed as "lateral epicondylitis."  When his symptoms remained unchanged in August, Dr. King recommended another lateral release procedure.

In November 1993, Irish began treatment with Dr. Steven Roth to address difficulty with concentration and memory.  Dr. Roth diagnosed attention deficit disorder and severe depression and prescribed Ritalin to treat the attention deficit disorder symptoms.  During the first month of treatment with Ritalin,

7

Irish improved feeling more productive and able to pursue activities more easily although the medication made him drowsy in the afternoon. In March 1994, Dr. Roth became more concerned about Irish's depression and decided to discontinue Ritalin and to prescribe Pamelor/Nortriptyline for depression instead. During a visit on April 14, 1994, Dr. Roth noted that Irish had had a good response to the new medication.

In his progress notes for June and July, Dr. Roth noted that Irish reported that he was psychologically "pretty good," although he was experiencing occasional hopeless feelings. He was not suicidal, and he was tired but not depressed. At the June 27 appointment, Irish reported a recent incident in which he was jailed for criminally threatening his children's school guidance counsellor. Dr. Roth diagnosed depression controlled by medication and questioned a conduct disorder in light of the school incident. When Irish was seen by Dr. Roth in August and September for other medical concerns, Dr. Roth noted that he was not suicidal or hopeless but was feeling increased helplessness.

In September 1994, Dr. Roth completed a medical assessment of Irish's mental abilities. He noted positive abilities that Irish has a fair to good ability to make occupational adjustments, a good to very good ability to make performance

8

adjustments, a fair to good ability to make personal/social adjustments, and was able to manage his own funds. Dr. Roth also noted negative attributes that he had an inability to follow through when a job became tedious or repetitive, that he was unable to relate to supervisors or to make transitions from one task to another, and that he was emotionally explosive and easily brought to tears.

Irish testified at the hearing held on September 21, 1994, that he was able to drive on a daily basis, mow the lawn, go for walks with his father-in-law, read, watch television, and volunteer at the public television station. He said that he belongs to an attention deficit support group and takes Nortriptyline to control his condition. He also testified that he takes Daypro regularly, which is used to control arthritis, and only occasionally takes Tylenol with codeine for pain.

A vocational expert, Catherine Chandick, testified at the hearing that Irish could perform substantial gainful activity based upon his age, education, experience, and RFC. The examples she cited were work as an escort driver and a cleaner. When a further impairment due to drowsiness from medication was added, Ms. Chandick testified that Irish would not be qualified to work as a driver. Despite all of Irish's limitations, Ms. Chandick

9

maintained that he would be able to perform as a cleaner limited to using his left arm for only one third of a day and that based on census codes and her own experience in job placements, approximately 745 such cleaner jobs would be available in the local economy and 175,450 existed in the national economy.

The ALJ determined that Irish had both a severe physical impairment to his left arm and a mental condition but that neither impairment nor both impairments combined met or equalled a listed condition. He then credited Irish's reported work restrictions and found, based on the vocational expert's testimony, that he could perform substantial gainful employment in the range of light work with further limitations on the use of his left arm. He then found that Irish was not disabled from work because, based on Ms. Chandick's testimony, jobs, such as the one-handed cleaner job, meeting his limitations existed in significant numbers in the local and national economies.

Irish requested review of the ALJ's decision by the Appeals Council which was denied on June 15, 1995. The decision was then appealed to this court.

## II.  **STANDARD OF REVIEW**

After a final determination by the Commissioner[4] and upon request by a party, this court is authorized to review the pleadings and the transcript of the record of the proceeding, and enter a judgment affirming, modifying, or reversing the decision. 42 U.S.C.A. § 405(g) (West Supp. 1995).  The court's review is limited in scope, however, as the Commissioner's factual findings are conclusive if they are supported by substantial evidence. Id.; Irlanda Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  Id. Therefore, the court must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  However, if the Commissioner has misapplied the law or

---

[4]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, effective March 31, 1995, the functions of the Secretary of Health and Human Services in social security cases were transferred to the Commissioner of Social Security. Pub.L. No. 103-296.

has failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary.  Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983).  See also Slessinger v. Secretary of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987).  I apply these standards in reviewing the issues Irish raises on appeal.

### III.  DISCUSSION

Irish challenges the ALJ's determinations at both the third and fifth steps of the sequential analysis.[5]  He argues that his mental disorder meets the listed criteria at step three and therefore, the ALJ erred in not finding him disabled at that

---

[5]  The ALJ is required to consider the following five steps when determining if a claimant is disabled:
> (1) whether the claimant is engaged in substantial gainful activity at the time of the claim;
> (2) whether the claimant has a severe impairment that has lasted for twelve months or had a severe impairment for a period of twelve months in the past;
> (3) whether the impairment meets or equals a listed impairment;
> (4) whether the impairment prevents or prevented the claimant from performing past relevant work;
> (5) whether the impairment prevents or prevented the claimant from doing any other work.

See 20 C.F.R. §§ 404.1520, 404.1509, 416.920 (1994).

point.  In addition, he argues that at step five the commissioner has not sustained her burden of proof because the vocational expert could not give examples of any jobs that Irish could perform that exist in significant numbers in the national economy.  I address each of his arguments in turn.

**A.    Step Three--Listed Impairment Due to Mental Disorder**

At step three of the sequential analysis, the ALJ evaluates the claimant's condition under the criteria provided in the Commissioner's regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d) (1994).  The claimant bears the burden of proving that he has an impairment that meets or equals the criteria of a listed impairment.  Dudley v. Secretary of Health and Human Services, 816 F.2d 792, 793 (1st Cir. 1987).  If the claimant meets his burden, the Commissioner is required to find the claimant disabled, and need go no further in the evaluation process.  Id.; see §§ 404.1520(d), 416.920(d).

In his decision, the ALJ found that the medical evidence established that Irish had depression with a history of ADHD.  He evaluated Irish's condition at step three of the analysis under

13

the criteria for an affective disorder[6] finding an adjustment

_____

   [6] The applicable listed criteria are found at Part 404,
Subpt. P, App. 1, § 12.04 (1994) and provide as follows:
   <u>Affective Disorders:</u> Characterized by a disturbance of
   mood, accompanied by a full or partial manic or
   depressive syndrome.  Mood refers to a prolonged
   emotion that colors the whole psychic life; it
   generally involves either depression or elation.
      The required level of severity for these disorders
   is met when the requirements in both A and B are
   satisfied.
      A. Medically documented persistence, either
   continuous or intermittent, or one of the following:
      1. Depressive syndrome characterized by at least four of
   the following:
      a. Anhedonia or pervasive loss of interest in almost
   all activities; or
      b. Appetite disturbance with change in weight;or
      c. Sleep disturbance; or
      d. Psychomotor agitation or retardation; or
      e. Decreased energy; or
      f. Feelings of guilt or worthlessness; or
      g. Difficulty concentrating or thinking; or
      h. Thoughts of suicide; or
      i. Hallucinations, delusions, or paranoid thinking; . . .
   AND
      B. Resulting in at least two of the following:
      1. Marked restriction of activities of daily living;
   or
      2. Marked difficulties in maintaining social
   functioning; or
      3. Deficiencies of concentration, persistence or pace
   resulting in frequent failure to complete tasks in a
   timely manner (in work settings or elsewhere); or
      4. Repeated episodes of deterioration or
   decompensation in work or work-like settings which
   cause the individual to withdraw from that situation or
   to experience exacerbation of signs and symptoms (which
   may include deterioration of adaptive behaviors).

disorder with a history of ADHD but not of sufficient severity to constitute total disability. Irish contends that the ALJ's evaluation was erroneous for not finding that his impairments met at least four of the listed criteria for depressive syndrome and that the effects have caused marked restrictions in his daily living and social interactions.

Specifically, Irish points to Dr. Roth's progress note in his medical records for June 1994 reporting that Irish had days when he experienced hopelessness lasting a few hours, difficulty sleeping at night, sleepiness during the day, and was crying with sad television shows.[7] The note also indicates that Irish was arrested at that time for criminally threatening a guidance counsellor.[8] In addition, Irish relies on Dr. Roth's Medical Assessment of Ability to Do Work Related Activities (Mental) completed on September 29, 1994. In the Assessment, Dr. Roth noted that Irish's history of ADHD and depression contributed to

---

[7] Irish also interprets the note to indicate feelings of helplessness but the symbol that Dr. Roth wrote next to helplessness negates that inference.

[8] Although Irish claims that his medical records are "replete" with evidence of episodes when his mental disorder caused difficulty, the only episode he describes is the criminal threatening incident.

15

cause an inability to follow through when a job becomes tedious or repetitive and that Irish is somewhat explosive in his emotions and easily brought to tears. Irish interpreted Dr. Roth's assessment to show that he would not be able to relate well to supervisors or to tolerate transitions from one task to another.

Despite Irish's contrary conclusion, substantial evidence supports the ALJ's determination that Irish's symptoms did not meet the criteria for depression. First, in the same June 1994 note Irish relies on, Dr. Roth wrote that Irish was not then taking his prescribed medication to control his symptoms and quoted Irish's own evaluation that psychologically he was "pretty good." By July, he was again taking his medication and reported that he was tired and occasionally felt hopeless, but he was not depressed, had no suicidal thoughts, and was not having a problem with crying. At that time he was also enjoying boating and tubing. In mid September 1994, Dr. Roth reported that Irish's mood was stable, that he had not been insomniac, and he was not feeling hopeless.

Dr. Roth's assessment evaluating Irish's ability to make occupational adjustments found that in the following areas his ability was good: "Follow Work Rules," "Relate to co-workers,"

16

and "Function independently." In the following areas his ability was rated good to fair: "Deal with the public," "Use judgment," "Interact with Supervisor(s)," "Deal with work Stresses," and "Maintain attention/concentration." Dr. Roth considered Irish's depression and ADHD, and his concerns about repetitive work and relating to supervisors in making his assessments. He did not rate Irish below good to fair in any category.

Dr. Roth found Irish's ability to make performance adjustments good to very good. In his assessment of ability to make personal and social adjustments, Dr. Roth rated "Maintain personal appearance" at good, and "Behave in an emotionally stable manner," "Relate predictably in social situations," and Demonstrate reliability" good to fair despite his stated concerns that Irish was somewhat explosive emotionally and capable of being easily brought to tears. In sum, the medical evidence supports the ALJ's evaluation that Irish's condition did not meet any of the depressive criteria. As Irish has not sustained his burden and substantial evidence exists to support the ALJ's decision, it is affirmed.

## B.   **Step Five--Availability of Work**

At step five, the Commissioner has the burden of showing that despite the severity of the claimant's impairment and

inability to return to past relevant work, he retains the RFC to perform other occupations that exist in significant numbers in the national economy and in the region where he lives. 20 C.F.R. §§ 404.1520(f), 416.920(f); Keating v. Secretary of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988). In determining whether work exists in significant numbers, the Commissioner may take administrative notice of job information from reliable government sources and other publications such as the Dictionary of Occupational Titles and the Census Reports. 20 C.F.R. §§ 404.1566(d), 416.966(d) (1994). Also, the Commissioner may use the services of a vocational expert to assist in determining whether a claimant's "skills can be used in other work and the specific occupations in which they can be used." Id. at §§ 404.1566(e), 416.966(e).

Irish challenges the ALJ's conclusion that he was not disabled arguing that there was no evidence that jobs that he could perform were available in significant numbers in the national economy.[9] At the hearing the vocational expert, Ms.

_____

[9] Although the government has responded to an issue about whether the ALJ adequately considered Irish's subjective complaints of pain, I find no such argument in Irish's pleadings. The cursory statement at the conclusion of Irish's memorandum that the ALJ did not consider Irish's probable difficulty in

18

Chandick, testified that he could do cleaning jobs with certain limitations to allow for the restrictions on using his left arm and hand. She testified that 745 such jobs existed in the local economy and approximately 175,450 jobs existed in the national economy based on her experience in job placement and using the census codes.

Irish's objection to the validity of Ms. Chandick's testimony is not entirely clear, but he seems to object to her reliance on her own experience in job placement to estimate the availability of cleaner jobs in the national economy. Irish, represented by counsel, did not object to Ms. Chandick's qualifications at the hearing. Irish cites no requirement that a vocational expert must rely exclusively on any particular data source about the availability of jobs nor does he provide any legal authority suggesting that a vocational expert's opinion based on her experience in job placement expanded by reference to

working under supervision is not supported by the record. First, Dr. Roth evaluated his ability to interact with supervisors as good to fair. Then, the ALJ included a limitation in his hypothetical to the vocational expert to avoid jobs that required working under direct supervision. The ALJ gave the issue appropriate consideration. To the extent that Irish intended any further challenge the ALJ's evaluation of his pain complaints or other components of his RFC, he has not presented sufficient argument in support of his claim to require analysis.

19

the census codes is unreliable.  See, e.g. Fed. R. Evid. 703.
Further, Irish does not argue that Ms. Chandick's opinion
conflicts with the job requirements in other reliable data
sources.  See, e.g., Williams v. Shalala, 997 F.2d 1494, 1500
(D.C. Cir. 1993).

An ALJ uses a vocational expert to provide an opinion, based
on his or her expertise, on complex issues about a claimant's
abilities and job market possibilities that cannot easily be
resolved by reference to manuals.  See 20 C.F.R. §§ 404.1566(e),
416.966(e); see also Vaughn v. Shalala, 58 F.3d 129, 132 (5th
Cir. 1995); Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir.
1991); Sample v. Schweiker, 694 F.2d 639, 643 (9th Cir. 1982).
I conclude that Ms. Chandick's opinion that a substantial number
of cleaning jobs, which Irish could perform despite his
limitations, exist in both the local and national economies
constitutes substantial evidence in support of the ALJ's
decision.  Consequently, I affirm the decision of the
Commissioner to deny benefits.


## IV.  CONCLUSION

For the foregoing reasons, the plaintiff's motion to reverse
(document no. 5) is denied.

20

        SO ORDERED.


                                        _____
                                        Paul Barbadoro
                                        United States District Judge

February 27, 1996

cc:  Vicki S. Roundy, Esq.
     David L. Broderick, Esq.


                                21