Russell v. SSA                    CV-03-23-B      1/9/04

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


Jane Ann Russell

        v.                              Civil No. 03-023-B
                                        Opinion No. 2004 DNH 009

Jo Anne B. Barnhart, Commissioner,
Social Security Administration


### MEMORANDUM AND ORDER


        Jane Ann Russell applied for Title II Social Security

Disability Insurance Benefits on August 8, 1996.  Russell alleged

an inability to work since June 16, 2000, due to migraines and

backache.  The Social Security Administration ("SSA") denied her

application initially and on reconsideration.  Administrative Law

Judge ("ALJ") Robert Klingebiel held a hearing on Russell's claim

on April 9, 2002.  In a decision dated May 30, 2002, the ALJ

found that Russell was not disabled.  On December 9, 2002, the

Appeals Council denied Russell's request for review, rendering

the ALJ's decision the final decision of the Commissioner of the SSA.

Russell brings this action pursuant to § 405(g) of the Social Security Act (the "Act") seeking review of the denial of her application for benefits. See 42 U.S.C. § 405(g) (2000). She challenges his determination that her subjective claims of pain and impairment were not credible, his decision not to give substantial weight to the opinion of the physician's assistant who treated her, and his determination that her migraines did not pose non-exertional limitations on her ability to work, thereby requiring the testimony of a vocational expert to determine if there were jobs she could perform. Before me are Plaintiff's Motion for Order Reversing the Decision of the Commissioner (Doc. No. 8) and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 10). For the reasons set forth below, I conclude that the ALJ's decision that Russell was not entitled to benefits is supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Russell's motion to reverse.

## I.  BACKGROUND[1]

Jane Russell was 41 years old at the time of the administrative hearing.  She had completed eighth grade and subsequently obtained her GED.  Her past relevant work was as a certified nursing assistant.[2]

Russell was treated for migraine headaches at the Hitchcock Clinic.  Clinical notes reveal that in April, 1999, she had full range of motion and full extremity strength, but tenderness to palpation at the occipital muscles and palpable tenderness over the paravertebral muscles of the cervical spine into the trapezia.  She was given an injection of Demerol[3] by Elizabeth Doak, a physician's assistant, which relieved her pain within fifteen minutes.  On August 29, 1999, Russell returned to the clinic, complaining of another severe migraine.  Doak noted

---

[1]  Unless otherwise noted, the procedural and factual background set forth in this Memorandum and Order derives (and at points is excepted verbatim) from the parties' Joint Statement of Material Facts (Doc. No. 11).

[2]  She testified to two different dates.  (Tr. at 34; Tr. at 38).  It appears that her doctors believed she was going to work at least through August 2000.  (Tr. at 213).

[3]  Demerol is used for the relief of pain.  Physicians' Desk Reference 2991 (57th ed. 2003).

that Russell had taken medications such as Skelaxin and Midrin[4] as well as over-the-counter pills, and continued to smoke. Doak again administered Demerol, which relieved Russell's pain within twenty minutes.

Three days later, Russell returned due to another migraine. Her symptoms were the same as during her previous visit. Doak suggested that Russell start exercising and stop smoking. She gave Russell a prescription for Inderal and Flexeril, and gave her a Toradol injection which relieved her headache within twenty minutes.[5] On September 8, Doak found some crepitus[6] with range of motion, pain with backward flexion of the neck and palpable tenderness over the cervical spine and paravertebral muscles. Otherwise, Russell's range of motion was full, extremity strength was five out of five, and there was no evidence of thoracic

---

[4] Midrin is used to treat tension or vascular headaches and Skelaxin is used to treat musculoskeletal discomfort. Physician's Desk Reference at 3366, 1274.

[5] Inderal is used prophylactically for migraines, Flexeril is used to relieve muscle spasms, and Toradol is used for short term pain management. Physicians' Desk Reference at 1280, 1897, and 2942.

[6] Crepitus is the grating of a joint. Stedman's at 424.

outlet syndrome.[7]  An X-ray of Russell's cervical spine was negative.  Doak refilled the prescription for Midrin and prescribed Ultram.[8]

On March 3, 2000, Russell was in a car accident.  She was seen in the emergency room of Catholic Medical Hospital.  Although she noted that she was not experiencing any neck pain, she stated that she had numbness in her left leg and pain in her mid-back.  She was discharged that day with a prescription for Celebrex[9] and Skelaxin and instructions to rest and use ice for the next 2-3 days.  On March 5, 2000, Dr. Gendron noted that Russell's lumbar spine X-rays were normal, that her symptoms appeared to exceed the findings of diffuse tenderness and decreased range of motion, and that she was requesting Percocet

_____

[7]  Thoracic outlet syndrome (TOS) consists of a group of distinct disorders that affect the nerves in the brachial plexus (nerves that pass into the arms from the neck) and various nerves and blood vessels between the base of the neck and axilla (armpit).  Stedman's at 1769.

[8]  Ultram is used to treat pain.  Physicians' Desk Reference at 2510.

[9]  Celebrex is used as treatment for osteoarthritis. Physicians' Desk Reference at 2589.

and Darvocet by name.[10]

On March 20, 2000, Dr. Webber examined Russell and noted that she was reporting more frequent headaches following the accident. Dr. Webber found that Russell had tenderness and pain radiating to her lower back. She prescribed Paxil[11] and indicated that Russell was to reduce usage of Flexeril and Celebrex, continue physical therapy, and that she could work up to four hours at a desk each day. Russell returned one week later complaining of a migraine and lower extremity numbness. She was given Imitrex[12] subcutaneously and forty minutes later her headache was partially relieved. On March 27, 2000, Russell reported that she developed another migraine when she ran out of Skelaxin, and could not return to work on Monday. Dr. Webber noted that Russell had been "real active scrubbing floors and mopping" the previous week. (Tr. at 197).

---

[10] Percocet and Darvocet are used to treat pain. Physicians' Desk Reference at 1304, 3503.

[11] Paxil is an anti-depressant. Physicians' Desk Reference at 1603.

[12] Imitrex is used for migraines. Physicians' Desk Reference at 1542.

On March 28, 2000, Russell underwent an electromyogram nerve conduction study,[13] which was limited due to her poor tolerance and only two muscles were examined. Dr. Indorf, who performed the study, determined that her nerve conduction was normal.

Dr. Webber examined Russell on April 24, 2000, and noted that she complained of being barely able to walk after working for four hours, but that she was improving with physical therapy. Her headache diary revealed that she was having headaches 40-50% of each week, with onset related to ingestion of caffeinated beverages. Dr. Webber found no evidence of neurological deficits, and instructed Russell to continue with Midrin and to reduce her caffeine and cheese intake.

On May 24, 2000, Dr. Webber, noted that Russell's headaches had decreased to one major headache per week, which Russell could control with Midrin and rest, that her straight leg raising was positive at sixty degrees bilaterally. He wrote a note indicating that Russell could work a seven-hour day with a ten minute break after a four-hour shift.

---

[13] An electromyogram yields a graphic representation of the electric current associated with muscle movement. Stedman's at 576.

On May 26, 2000, Russell had a rheumatological consultation with Dr. Yost. He observed that her straight leg raise test was negative and that she had full range of motion in her hips, shoulders, cervical and thoracic spine. There were marked reductions to her lumbar spine forward flexion and moderate restrictions in her extension and lateral flexion, her sensation was intact and her muscle strength was five-plus out of five except for some weakness due to hip flexion. He noted a lack of malingering behavior, and arranged for a lumbrosacral spine MRI, the results of which were negative.

On July 26, 2000, Dr. Rholl noted that Russell was complaining of an increase in her headaches, but indicated that it coincided with her running out of Paxil. He also found that her gait was slightly stiff and her sensation was subjectively decreased, but she was able to feel and her strength was normal. He prescribed Flexeril and Vicodin. Dr. Rholl saw her again on August 31, 2000, because she was complaining that "[s]he just does not have a life because of her headaches and because of her back pain." (Tr. at 233). Russell was tender in some points, but not many, and she had full range of motion. He felt Russell

needed to be seen at the Pain Clinic, and was concerned about her use of narcotics such as Vicodin.  He saw her again on September 8, 2000 for recurrent headaches, one of which lasted from a Friday through that Sunday.

On October 17, 2000, Russell went to the Pain Clinic, where she was seen by Dr. Caudill-Slosberg.  Dr. Claudill-Slosberg observed "considerable pain behavior with wincing and groaning as well as statements that she was being killed by the examination." (Tr. at 238-39).  Russell was able to walk on her toes and heels, her pinprick sensation was intact, and her Babinski reflex was negative.  Plaintiff was prescribed an increased dose of Amtriptyline,[14] Soma for mild to moderate pain, and Zomig[15] for severe pain.  She recommended that Russell begin physical therapy and take Motrin or Naprosyn for her head pain.  She noted that Russell reported that she had stopped taking Paxil due to its cost.

---

[14]  Amtriptyline is an antidepressant. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html (last revised 1/1/03).

[15]  Zomig is used to treat migraines.  Physicians' Desk Reference at 701.

On November 7, 2000, Russell consulted with Sharon Lockwood, a Physician's Assistant at the Pain Clinic. Russell reported having four severe headaches each week, which were accompanied by photophobia (pain induced by exposure to light), nausea and vomiting. Lockwood found crepitus over the left TMJ and diffuse tenderness in the posterior neck with decreased extension and rotation, and observed that Russell's motor, tone, strength and sensory systems were normal. Lockwood gave her Prednisone, Norflex, Amerge and Reglan for pain treatment, and Klonopin to help her sleep. Russell was advised to eat routinely, drink fluids, stop smoking, and engage in daily meditation.

On November 27, 2000, Russell had X-rays taken of her left hip and lumbar spine. They revealed osteoarthritis and degenerative changes in the lower thoracic spine. On December 12, 2000, Russell reported to Lockwood that she was having four mild headaches per week, and a more severe headache one to three times per week.

On January 31, 2001, Dr. Beasley determined that Russell had tenderness over the occipital nerve on the left side. Between February 20 and May 22, 2001, Russell was seen at the Hitchcock

Clinic five times for her migraines, and prescribed Norco, Pamelor, Vioxx, Compazine and Dilaudid suppositories and Neurontin.[16] During that time, Lockwood noted that Russell's levels of Depakote were much lower than expected if she were taking the amount prescribed. (Tr. at 296). Further, Russell ran out of TENS unit pads and stopped using it. Russell did not have medical insurance and therefore had to work with the clinic for samples and other low-cost options. On March 9, Lockwood noted that Russell had called in, to complain of a migraine and ask for a prescription to be telephoned to her local pharmacy. She said that she had no transportation to the clinic to be seen. When her local pharmacy did not have the medicine, however, she was able to have it picked up at the clinic pharmacy. (Tr. at 293). When asked to explain on March 14, Russell stated that she been unable to get out of bed, and her daughter had picked it up. (Tr. at 294).

On April 3, 2001, Russell had an MRI of her head. It revealed a small area of signal alteration within the subcortical

_____

[16] Dilaudid and Norco are used to treat pain and Neurontin is used to treat partial seizures. Compazine is for the control of severe nausea and vomiting. Vioxx is an anti-inflamatory. Physician's Desk Reference at 3505, 3327, 2563, 1489, 2120.

white matter of the left frontal lobe and the left caudate nucleus. On May 1, 2001, Lockwood noted that Russell reported having been to an emergency room because of a migraine and had been given a Demerol injection. However, Russell had apparently changed her medication regime abruptly without consulting Lockwood. (Tr. at 413). On June 3, 2001, Russell went to urgent care for a Torodol injection due to an acute migraine. At that time, she reported that she had been to the emergency room the week before for the same reason.

On June 5, 2001, Lockwood noted that Russell was only experiencing one severe headache per week, and that her condition was responding well to Norco and her TENS unit, which she had been given to use to reduce her headaches. On that day, Russell was complaining of a severe migraine, and Lockwood noted that she was tender and tight in the posterior neck and had pain on rotation of the neck. Russell's vision, sensation and hearing were decreased, but her motor tone, strength, reflexes, coordination and gait were normal. At a June 27, 2001 visit, Lockwood noted that Russell had again been to urgent care for an injection three days earlier.

On July 7,2001, Russell sprained her ankle and was given Vicodin for four days. After she stopped, she had another severe headache. (Tr. at 411). Dr. Rholl saw Russell on July 19, 2001, and noted that she was walking one mile five times each day (Tr. at 313), but that she was experiencing three bad headaches each week. She had full range of motion in her neck and back and her straight leg raise was negative. Dr. Rholl felt that "narcotic use was not the way to go for her pains." On August 6, 2001, Russell was examined by Dr. Levin, who also recommended that Russell decrease her use of narcotics, and opined that she might be experiencing analgesic rebound and habituation. He diagnosed her with chronic pain disorder with features of post-concussive syndrome, headaches, cervicalgia and cervicogenic headache. On August 24, 2001, she reported to Dr. Beasley that she was experiencing three days of major headaches per week.

On August 27, 2001, Russell underwent an occipital nerve block. She later told Lockwood that she had been bedridden for three days afterwards due to pain. However, she was walking four times per week, and her TENS unit was helpful. Lockwood increased Russell's Zanaflex and insisted that she attend pain

group meetings. She had an X-ray on September 21, 2001, which was normal.

On September 25, 2001, Russell called the clinic, reporting a headache, and that she had gone to the emergency room the previous Thursday and Sunday for shots to help with headaches. She was instructed to exercise, eat regular, balanced meals, stop smoking, drink water, and attend group. Russell states that she did all that, but couldn't afford group. When told that she could pick up free samples of medication at her convenience, she said she couldn't come in that day, and that she guessed she'd have to suffer. (Tr. at 428). Russell did not show up for scheduled appointment on October 2, 2001, after calling to say that she had no money for a cab and could not find a ride. (Tr. at 420, 430). However, on October 9, 2001, Russell told Lockwood that the previous week she went to the emergency room and obtained a Demerol injection for a severe headache. Russell also informed Lockwood that she could not afford pain class. On November 6, 2001, Dr. Levin observed extreme tenderness over the occipital nerve and posterior cervical musculature, but Russell's neurological examination was normal with no signs of

radiculopathy.  Dr. Levin advised her to stop smoking, discontinue Neurontin, and increase Zanaflex.  They discussed inpatient care for her migraines, concluding that it was not indicated.  (Tr. at 433).  On November 20, 2001, Russell told Lockwood that she was experiencing a severe headache three times per week and had been to the emergency room one to two times each week since her last visit, but reported that she was walking five times a week and sleeping six hours.  Lockwood noted that Russell smelled strongly of smoke.

On January 16, 2002, Lockwood noted that Russell had not had an emergency injection in several months, that Russell was attending pain group, but had not quit smoking.  Her neck rotation was limited and her hearing slightly decreased on the left side.

On April 2, 2002, Lockwood completed a Headache Residual Functional Capacity Questionnaire.  Lockwood noted that Russell experienced severe pain three times per week at her left occipital which radiated to her left temple and this pain was accompanied by vertigo, nausea, photosensitivity and visual disturbances.  Lockwood concluded that Russell would need to lie down at unpredictable intervals during a work shift, had poor or

no ability to deal with stress and would be absent from work three or more times a month due to her impairment.

Russell also received medical care for leg numbness. She complained of paresthesias in her lower left extremity and anterior tibial area on February 9, 2000, but Dr. Webber noted at the time that she did not appear to be in distress or discomfort. Dr. Indorf, on referral, found that her gait had an antalgic[17] quality, but her cranial nerves were normal and her strength and tone were normal and her Romberg test was negative. A Venous Doppler Ultrasound performed on February 28, 2000 was negative.

On January 31, 2001, a non-treating physician, Dr. Cataldo, reviewed Russell's medical records. He concluded that she could lift ten pounds frequently, twenty pounds occasionally, and could sit, stand, or walk for six hours in an eight hour day, as well as push or pull in an unlimited fashion. (Tr. at 273-78). He also concluded that she had occasional limitations to her postural activities. Further, in his narrative he stated that her allegations of symptoms were partially credible, but not for her ability to function, as she could do housecleaning, shopping,

---

[17] In a manner to decrease pain. Stedman's at 67, 94.

leave the house at will, drive a car and socialize outside the home.  No other physician evaluated Russell's residual capacity to perform work.

## II.  **STANDARD OF REVIEW**

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision.  42 U.S.C. § 405(g) (2003).  My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence.  Id.; see Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  See Ortiz, 955 F.2d at 769.  Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it

as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriquez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). I apply these standards in reviewing Russell's case on appeal.

## III. DISCUSSION

The Social Security Act defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2003). When evaluating whether a claimant is disabled due to a physical or mental impairment, an ALJ's analysis is governed by a five-step sequential evaluation process.[18] See 20 C.F.R. § 404.1520 (2003).

_____

[18] The ALJ is required to consider the following five issues when determining if a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work. 20 C.F.R. §

-18-

Ultimately, at step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." 20 C.F.R. § 416.920(f) (2003); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam). The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job. See Keating, 848 F.2d at 276.

At step five, the ALJ found that Russell had a severe impairment that precluded a return to her former employment and limited the range of work she could perform. Nevertheless, he found that she could perform a full range of light work and thus was not disabled because there were jobs in the national economy that she could perform.

Russell challenges this conclusion, stating that the ALJ erred in his decisions regarding the (1) degree of her impairment, (2) whether the impairment created had non-exertional

404.1520 (2003).

-19-

limitations on her ability to work, and (3) in finding that she could perform other work.

Her challenge attacks specific conclusions the ALJ made in determining her credibility. She claims the evidence does not support his conclusions that (1) her statements regarding her capabilities were "not supported by objective medical evidence," (2) she failed to follow prescribed treatments on a regular basis, and (3) "her reports are inconsistent both internally and as compared to the objective medical evidence and her activities of daily living." (Tr. at 18). Russell asserts that the ALJ did not consider her subjective complaints of pain in the proper legal context, distorted the evidence, and was selective in his consideration of it. She also contends that the ALJ did not give proper weight to the opinion of Sharon Lockwood, the Physician's Assistant who was her primary contact at the Pain Clinic.

Lastly, she asserts that the ALJ did not adequately establish that there were other jobs in the national economy that she could perform because she feels he did not consider or give appropriate weight to the non-exertional limitations of her headaches.

## A. Weight Given to Subjective Complaints of Pain

The SSA regulations require an ALJ to consider a claimant's own subjective statements concerning her symptoms, including statements regarding how those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) (2000). A claimant's subjective statements may suggest a more severe impairment "than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). Accordingly, an ALJ evaluates a claimant's complaints in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate his pain; (5) treatment, other than medication, the claimant receives or has received for relief of his pain; (6) any measures the claimant uses or has used to relieve pain; and (7) other factors concerning the claimant's limitations and restrictions due to pain. Id.; see Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 28-29 (1st Cir. 1986). These factors are sometimes called the "Avery factors." In addition to considering these factors, the ALJ is entitled to

-21-

observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence.  See Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In assessing the credibility of a claimant's subjective statements, the ALJ must consider whether these complaints are consistent with the objective medical evidence and other evidence in the record.  See 20 C.F.R. § 1529(a), SSR 96-7(p).  While a claimant's complaints must be consistent with the medical evidence to be credited, they need not be precisely corroborated with such evidence.  See Dupuis v. Sec'y of Health and Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per curiam).

Here, the ALJ took into consideration the Avery factors and listed them in his opinion.  (Tr. at 16).  He cited several instances from the record which demonstrated that she had not complied completely with treatment, such as that she never completely quit smoking, and had run out of medication and not tried to obtain more until another migraine ensued.  (Tr. at 16-17).[19]  He also noted that she had been observed walking better

_____

[19]  Russell also asserts that the major reason for her non-compliance with treatment was that she could not afford her

-22-

leaving the examination room than when she entered. (Tr. at 16-17, 185). He noted that the objective medical evidence was not strong - the only test that showed anything that might support an impairment was the MRI, which showed only a slight abnormality. Id. Keeping in mind that credibility determinations are for the ALJ, and that here his determination that Russell was not entirely credible in her assertions of impairment was clearly supported by evidence, I decline to remand or reverse on that ground. The ALJ clearly reviewed all the relevant evidence, considered it in the proper legal context, and came to a supportable and reasoned conclusion regarding Russell's credibility.

## B.  Weight Given to Opinion of Sharon Lockwood

The ALJ noted that the only assessment that supported Russell's asserted level of impairment was that provided by Lockwood. Because Lockwood is a Physician's Assistant, the ALJ

---

prescribed medications and should not be punished therefore. However, the record is replete with instances of the clinic providing her with free samples and offering to work with her to obtain funding for her medication. (Tr. at 250). The evidence shows a pattern of her taking medication and controlling her headaches successfully until her medications ran out, at which point she then visited first the emergency room and then the clinic for further treatment and narcotics.

determined that her assessment was not an "acceptable medical source" and therefore did not carry substantial evidentiary weight.[20] All other medical opinions, including those provided by the state's medical examiners and other doctors who examined and treated Russell, did not support a finding of complete impairment. The ALJ concluded, therefore, that Russell retained the residual functional capacity to "lift 20 pounds occasionally and 10 pounds frequently, to stand and walk for 6 hours out of an 8 hour workday, to sit for 6 hours out of an 8 hour workday, and occasionally to climb, balance, bend, stoop, crouch, crawl, and kneel." (Tr. at 17). Russell contends that this conclusion was inappropriate, because the ALJ should have given more weight to Lockwood's opinion, although she concedes that he was correct in his determination that she was not an "acceptable source".[21] (Pl.'s Mot. for Order Reversing the Decision of the Comm'r. at

---

[20] When Russell's claim was reviewed by the Appeals Council, Lockwood's assessment had been co-signed by Dr. Richmond. However, the assessment itself contains no medical findings, but is merely an opinion on an issue that is for the ALJ to determine. Nor does the assessment suggest that Dr. Richmond ever examined Russell himself.

[21] A physician's assistant's opinion is an "other source" acceptable for consideration as part of the complete record under 20 C.F.R. § 416.913(e).

17). I disagree.

The ultimate decision concerning disability or impairment is for the commissioner, not the treating doctors. 20 C.F.R § 404(e)(1). Lockwood's opinion of disability is not determinative, so it was not error per se for the ALJ to reach a contrary conclusion. Further, the ALJ clearly considered the opinion, but given the weight of other acceptable medical sources supporting his conclusion that Russell could work, his decision to discount Lockwood's assessment was not error.

C. **Sufficiency of other evidence regarding Residual Functional Capacity**

Russell contends that once the ALJ determined that he would not accept Lockwood's opinion as authoritative, he should have requested an opinion from one of her treating doctors, or employed the services of a medical expert. (Pl.'s Mot. for Order Reversing the Decision of the Comm'r. at 18). While this might make sense in the absence of other medical evidence and opinion, the ALJ had the benefit of the opinion of Russell's primary care physician from January 2000 to June 2000, Dr. Webber (Tr. at 146, 213), who saw her as early as October 1998 (Tr. at 352). Throughout her treatment of Russell, Dr. Webber continued to send

Russell to work and wrote notes indicating that she intended to follow a course of "work hardening." (Tr. at 204, 213, 215). Dr. Rholl, who saw Russell off and on before 2000 (Tr. at 351) and became her primary care physician after Dr. Webber (Tr. at 213), continued to send Russell to work. (Tr. at 232). Further, a state medical examiner reviewed Russell's file in June 2001, and determined that she could work. (Tr. at 272-80). Given all of this evidence supporting his conclusion, I believe that requesting further review or reports from doctors would not have aided the ALJ in his decision-making, and that he was therefore justified in declining to request further information.

Russell's daily activities supported a conclusion that she could work. Russell reported that she took four hours to clean her four room apartment, that she occasionally accompanied her boyfriend on shopping trips, and that she volunteered at her son's school. This supported the ALJ's determination that she was not disabled.

Russell also complains that the ALJ erred in his conclusion that her migraines responded well to treatment. As noted above in footnote 20, the record shows that when Russell complied with her treatment program and took her prescribed medication, her

migraines were controlled.  Further, her insistence on use of
narcotics as opposed to other methods of treatment may have
actually increased her headaches.  (Tr at 237, 310, 314).  I note
that shortly after being told not to use narcotics, she twisted
her ankle and specifically requested them.  (Tr. at 315, 317).

D.    **The ALJ Appropriately Used the Medical-Vocational
      Tables to Establish That Russell Could Perform Other Work**

The ALJ relied on Medical-Vocational Rules 202.21 and 202.22
to determine the range of work Russell could perform.  Russell
contends that this was improper because she claims that her
migraines constitute a non-exertional limitation that called for
testimony from a vocational expert.  However, as pointed out by
the Commissioner, the ALJ found no evidence of any non-exertional
limitation created by the migraines, nor does plaintiff cite any
in her brief.  She merely states, without record support, that
her headaches require her to recline in a darkened room.[22]
Having reviewed the record, the ALJ determined that there was
little or no objective evidence to support the frequency or

---

[22]  The statement that "[t]he large volume of evidence in
the record clearly supports this contention" is insufficient to
carry her burden at this stage, in which she is challenging the
ALJ's decision.

severity of the headaches as reported by Russell. He noted the MRI which showed a slight abnormality in the white matter of her left frontal lobe, but observed that her headaches responded well to treatment[23] and that he did not find her statements of severity credible. Therefore, he did not find that they influenced, non-exertionally or otherwise, her ability to work. Since credibility determinations are for the ALJ, and there was substantial evidence to support his finding that her migraines had no non-exertional impact on her residual functional capacity, I decline to remand or reverse on that ground.

## IV. CONCLUSION

Since I have determined that the ALJ's denial of Russell's application for benefits was supported by substantial evidence, I affirm the Commissioner's decision. Accordingly, Russell's Motion to Reverse (Doc. No. 8) is denied, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No.

---

[23] Russell also disagrees with this contention. However, given evidence in the record that when she gradually weaned off narcotics, took Paxil, used her TENS unit, and exercised, her headaches reduced, I find that was substantial evidence to support this finding.

10) is granted.  The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 9, 2004

cc: Raymond J. Kelly, Esq.
    David L. Broderick, Esq.