**UNITED STATES, Appellee,**

v.

**Charles T. McMAHON,
Defendant, Appellant.**

No. 90–1427.

United States Court of Appeals,
First Circuit.

Heard May 9, 1991.

Decided July 29, 1991.

---

Richard Abbott with whom Jeffrey A. Denner and Denner & Associates were on brief, for appellant.

David A. Vicinanzo, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., was on brief, for appellee.

Before CAMPBELL and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.

COFFIN, Senior Circuit Judge.

Appellant, Charles McMahon, was convicted of conspiracy to commit extortion, attempt to commit extortion, several counts of using a facility in interstate commerce (the telephone) to promote unlawful activity, and making false material declarations before a grand jury. He asserts a variety of errors at his trial. We affirm.

## I. *Background*

In 1985, James Proko sought approval of his proposed Honda dealership from the

Salem, New Hampshire planning board. Prior to the meeting at which the plan was to be discussed, Proko was contacted by William Hicks, a wealthy retired car dealer. Hicks claimed to control the votes of the planning board and demanded $10,000 from Proko to assure approval of the site. Proko called the FBI.

Under FBI supervision, Proko continued to engage in negotiations with Hicks and attempted to get Hicks to reveal the identities of those board members whose votes he allegedly controlled. Hicks never singled out any person. He eventually was tried and convicted of extortion, and his conviction was affirmed on appeal. At the time of his incarceration, Hicks finally implicated McMahon, a member of the planning board who used to work for Hicks, alleging that McMahon had needed money and had planned the whole affair. The grand jury returned a seventeen-count indictment against McMahon.

Hicks claimed that McMahon had asked him to approach Proko and had consulted with Hicks on the ensuing negotiations. Telephone toll records reflected multiple telephone calls between Hicks and McMahon during the two weeks between May 28 and June 12, 1985. On June 11, during the meeting to approve the plan, McMahon raised multiple objections to the proposed plan. At the last minute, after a motion to approve the plan had been made, he suddenly claimed to remember the potential applicability of a Salem ordinance requiring that sellers of used cars not be located within 2,000 feet of one another. McMahon noted that Rogers' service station, which was principally located in the next township of Windham but straddled the Windham/Salem town line, sold some used cars. McMahon questioned whether the ordinance would be applicable if the cars were sold from that portion of the land located in Salem. He ultimately proposed approving the plan, contingent on the outcome of the township attorney's review. Ten days later, the township attorney issued his opinion that the ordinance was inapplicable.

Although McMahon claimed to have remembered the ordinance only at the end of the meeting, the government introduced testimony from the planning director, Ross Moldoff, that immediately before the meeting he had overheard McMahon attempt to recruit another board member, George Salisbury, to help him block the plan. Another board member also testified to the content of a note he observed McMahon pass to Salisbury at the beginning of the meeting that referred to blocking the plan based on the 2,000–foot ordinance.

McMahon eventually was convicted on all but one count of the indictment. On appeal, he raises four preserved errors. First, he argues that the district court erred when it refused to allow the defense access to Salisbury's grand jury testimony. Second, he complains that evidence of his financial condition was improperly admitted. Third, he suggests that evidence of the contents of the note that he allegedly passed at the planning board meeting was improperly admitted. Fourth, he asserts that the evidence was insufficient as a matter of law to support conviction. McMahon also raises a number of unpreserved claims and suggests that he was denied the effective assistance of counsel.

## II. *Preserved Errors*

### A. *Witness Grand Jury Testimony*

■ McMahon argues that he was deprived of his Sixth Amendment right to a fair trial and his Due Process right when he was denied access to the grand jury testimony of his key witness, George Salisbury. During cross-examination, the government referred to Salisbury's grand jury testimony and attempted to impeach Salisbury by using a copy of the transcript. At several points, Salisbury was asked to read from his testimony. During this cross-examination, the defendant renewed his pretrial request for a copy of Salisbury's grand jury testimony. The district court denied the motion, relying on *United States v. Hicks*, 848 F.2d 1, 4 (1st Cir.1988).

In *Hicks*, this court held that a defendant is not entitled to examine the grand jury testimony of potential witnesses who are

not called to testify. The court held that if the defense has the ability to interview the witness and discover exculpatory information, the government is not meaningfully suppressing that information. The court specifically observed in dicta, however, that "if the defendant does call the witness at trial, and the witness' trial testimony *could be refreshed or impeached* by the grand jury testimony, the defendant should have access to the earlier statements." *Id.* at 4 (emphasis added) (citing *United States v. Ruggiero*, 472 F.2d 599, 605 (2d Cir.1973)). In this case, not only *could* the witness be impeached and have his recollection refreshed, the government actually showed the grand jury transcript to the witness during cross-examination. The language from *Hicks*, therefore, suggests that McMahon should have been entitled to review Salisbury's grand jury testimony once the government had used it to cross-examine.

The Supreme Court repeatedly has recognized the importance of secrecy in grand jury proceedings, even after, as in this case, the grand jury has concluded its function. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979). The Court has identified several factors underlying the tradition of secrecy:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Id.* at 219, 99 S.Ct. at 1673. In determining whether to break that traditional secrecy, parties seeking disclosure must show "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Id.* at 222, 99 S.Ct. at 1674. A court called upon to determine whether grand jury transcripts should be released has substantial discretion. *See, e.g., id.; Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 396–97, 79 S.Ct. 1237, 1239–40, 3 L.Ed.2d 1323 (1959). That discretion, however, is not unlimited. *See Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (finding an abuse of discretion in not making grand jury testimony available for cross-examination of government witnesses).

In this case, the length of time between the grand jury testimony and Salisbury's testimony at trial (five years) both increased the potential need to refresh Salisbury's recollection and simultaneously lessened the need for grand jury secrecy. *See Douglas Oil*, 441 U.S. at 223, 99 S.Ct. at 1675 (as considerations justifying secrecy become less relevant, party asserting need will have lesser burden in showing justification); *Dennis*, 384 U.S. at 870, 872, 86 S.Ct. at 1849, 1850; *United States v. Evans & Assoc. Const. Co., Inc.*, 839 F.2d 656, 659 (10th Cir.1988); *In re Grand Jury Proceedings GJ–76–4 & GJ–75–3*, 800 F.2d 1293, 1301 (4th Cir.1986). Moreover, despite the fact that the government attempted to impeach Salisbury during cross-examination with his grand jury testimony, the court never reviewed the transcript in camera to determine whether there was any contradictory testimony or whether the transcript was being used improperly, nor implemented any other discretionary protective measure. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940) (not error for district court to deny defense review of grand jury testimony of witnesses where testimony used selectively and never shown to witnesses and where court implemented protective procedures to prevent improper use). As the Supreme Court

has noted, "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." *Dennis*, 384 U.S. at 873, 86 S.Ct. at 1850. We therefore think that the government's decision to use the transcript to impeach the defendant's witness created a sufficiently particularized need on the part of the defendant to review the testimony for purposes of rehabilitation. *See Dennis*, 384 U.S. at 870, 86 S.Ct. at 1849 (" '[P]roblems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility ...' are 'cases of particularized need where the secrecy of the proceedings is lifted discretely and limitedly.' ") (quoting *United States v. Procter & Gamble*, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958)).

■ This conclusion, however, does not end our review. Since *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court repeatedly has observed that even constitutional error at trial generally is subject to review for harmlessness.[1] *See Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991) (citing cases). The *Chapman* test requires that this court determine "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Yates v. Evatt*, —— U.S. ——, ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). *See also Fulminante*, 111 S.Ct. at 1257; *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (*Chapman* excuses errors that were " 'harmless' in terms of their effect on the factfinding process at trial").

"To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous." *Yates*, —— U.S. at ——, 111 S.Ct. at 1893. In considering whether an error has been harmless, the court must consider the entire record. *Id.; United States v. Hasting*, 461 U.S. 499, 509 n. 7, 103 S.Ct. 1974, 1981 n. 7, 76 L.Ed.2d 96 (1983). "Thus, to say that [an error] did not contribute to the verdict is to make a judgment about the significance of [the error] to reasonable jurors, when measured against the other evidence considered by those jurors independently...." *Yates*, —— U.S. at ——, 111 S.Ct. at 1893.

In this case, Salisbury's grand jury testimony was used by the government in several discrete respects during a cross-examination that impeached him on a variety of issues. The government contends that the substantial impeachment of the witness without the aid of the grand jury testimony and the minor references to that testimony rendered any error harmless. We agree.

On cross-examination, Salisbury was asked several things about his grand jury testimony. First, he was asked if he had been passed a note by McMahon with respect to the Proko Honda site. The government attorney asked him to read what he had said, and Salisbury read "I stated that I never received a note.... We passed candy.... We passed slips of paper between us all evening. I don't recall ever receiving a note from him like that." This testimony was unchallenged and consistent with his testimony at trial. The government did, however, suggest that, because both McMahon and Salisbury mentioned to the grand jury that they had passed candy, they may have collaborated.

Second, the government asked some questions about the Salem ordinance governing the location of used car dealerships. The government mentioned that Salisbury had testified to the grand jury about the applicability of the ordinance to the Rogers' service station. The government then somewhat obliquely asked Salisbury wheth-

---

**1.** Although the defendant has not spelled out his claim of Due Process or Sixth Amendment error, we shall presume without deciding that the error implicated a constitutional right. *See*

*United States v. Simmons,* 923 F.2d 934, 944 (2d Cir.1991) (assuming Sixth Amendment violation, but finding error harmless).

er he had told the grand jury that the land in question was wooded. Salisbury could not recall, indicating that if the transcript recorded that he had made the statement, then he had made it. He could only recall at the time of trial that some portion of the garage property was located in Salem.

Third, the government referred to Salisbury's direct testimony about a trip he made with McMahon to Raymond, New Hampshire to explore a possible land purchase, and the venture's ultimate failure to get off the ground. The government pointed out that in his grand jury testimony Salisbury had stated that an option had been placed on the property. Salisbury clarified that he had investigated the site with McMahon and another individual, Jack Garabedian, but had concluded that he was not interested. Garabedian also had expressed some interest in buying the property for a family trust. Salisbury could not recall if an option ever was taken.

Fourth, the prosecutor asked if Salisbury had attended meetings of the Salem Businessmen and Professional Association. Salisbury indicated that he had attended one meeting. The government asked if he had told the grand jury that he had gone twice. Salisbury repeated that he had attended only one meeting and the government did not press the point.

These uses of the grand jury testimony cannot in context amount to reversible error. Their import in light of the total evidence was extremely slight. And none was emphasized by the prosecutor in his closing argument. *Cf. United States v. Rubin,* 559 F.2d 975, 987 (5th Cir.1977) (although grand jury silence was emphasized in closing, it was not emphasized more forcefully than other impeachment evidence), *vacated and remanded on other grounds,* 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). In addition, the evidence against McMahon included direct testimony from Hicks that was corroborated by telephone call records, testimony of FBI agents, and testimony of other planning board members.

More specifically, it is not clear what additional significance Salisbury's attendance at two Salem Businessmen and Pro-

fessional Association meetings rather than one could have had. In addition, Salisbury was quite clear about having attended only one meeting and the government did not press the point after his reply. Moreover, Salisbury already had testified on direct about his exploratory business trip with McMahon and Garabedian. The incident is relevant to the personal relationship between McMahon and Salisbury; whether or not an option was placed on the property seems irrelevant. Further, Salisbury's discussion of the 2,000–foot ordinance before the grand jury was predictable and not contradictory, and we are unable to discern any significant impeachment value in knowing that Salisbury had told the grand jury but could not presently recall that a portion of the service station site was wooded. Finally, the fact that both Salisbury and McMahon mentioned that they had passed candy during the meeting can at best have served as the tiniest suggestion of collaboration, a suggestion much more forcibly made by the government's non-grand jury cross-examination. In other questioning, the government brought out the fact that Salisbury belonged to the same self-defined "faction" of the board as McMahon, that he shared acquaintances with McMahon, and that he had driven to the grand jury proceedings with McMahon. In this context, we think that the mention by both that they had passed candy at the meeting was harmless. *See Simmons,* 923 F.2d at 945.

McMahon stresses that credibility was a critical issue in this trial. He suggests, therefore, that Salisbury's credibility was essential and that anything affecting his credibility could not be harmless. As we have noted, however, it is dubious whether the testimony had any impeachment effect at all. Salisbury did not contradict anything he earlier stated before the grand jury. To the extent that the government's cross-examination arguably implied the contrary, the effect on Salisbury's credibility could only have been minimal. Salisbury was impeached on a variety of issues without the use of the grand jury testimony, including his previously mentioned connections with McMahon and his failure to

recuse himself from votes concerning his landlord and friend, Garabedian.

Finally, although we have said that McMahon was entitled to Salisbury's grand jury testimony despite the fact that he was a defense witness and available to McMahon, his availability substantially undercuts any significant claim of harm. Salisbury may not have been able to recall precisely his testimony of five years before, but he clearly should have been able to indicate the general content of that testimony. The defendant has not suggested the existence of any information that was likely to have assisted his witness' credibility. Moreover, because the defense generally was able to know the content of the grand jury testimony, McMahon should have been able on redirect to eviscerate the impression of contradiction. He could, for example, have asked Salisbury again whether he had testified before the grand jury that he had attended a meeting of the Salem Businessmen and Professional Association more than once.

In conclusion, after looking at the whole record, we do not think that the district court's denial of access to Salisbury's grand jury testimony could have contributed to the verdict. *Yates*, — U.S. at —, 111 S.Ct. at 1893. We therefore conclude that it was harmless beyond a reasonable doubt.

## B. *Evidence of Financial Condition*

■ McMahon argues that the court erred in admitting evidence that he needed to take advances on his salary and that he had taken a second mortgage on his house. First, he suggests that it was character evidence of a "prior bad act" introduced solely in order to show his propensity to commit similar acts, and thus was inadmissible under Fed.R.Evid. 404(b). He also argues that, even if relevant on an issue other than propensity, the probative value

of the evidence was substantially outweighed by the danger of unfair prejudice and should have been excluded. *See* Fed. R.Evid. 403; *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990) (Rule 404(b) evidence that is relevant on issue other than propensity still must survive test of Rule 403 that probative value is not substantially outweighed by unfair prejudice).[2]

We see no violation of Rule 404(b). The evidence was not introduced to show McMahon's character—that is, for example, that he was the sort of person who would do anything for money. It was evidence that he had a present motive for acquiring money. Rule 404(b) specifically provides that evidence of prior acts may be admitted for reasons other than to prove actions in conformity with past behavior, specifically including proof of motive. *See* Fed.R.Evid. 404(b). The court clearly did not abuse its discretion by finding the evidence relevant to an issue other than propensity. *See Ferrer–Cruz*, 899 F.2d at 137 (Rule 404(b) only presents absolute bar to admission where evidence "is relevant *only* because it shows bad character....").

■ With respect to the relative weighing of probative value and prejudicial impact, we repeatedly have held that the admission or exclusion of evidence under Fed. R.Evid. 403 is committed to the district court's broad discretion. *See Pinkham v. Burgess*, 933 F.2d 1066, 1071–72 (1st Cir. 1991); *Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987). We will not overturn such a decision absent compelling circumstances. *Id.*

McMahon claims that the evidence about pay advances related to events occurring several months prior to the onset of the conspiracy and therefore was minimally probative. He also contends that the evidence was weak because it did not show that he was behind in any payments or in

**2.** During the hearing on McMahon's motions *in limine,* McMahon never objected to the evidence on the ground of Rule 404(b). *See United States v. Williams,* 809 F.2d 75, 82 (1st Cir.1986) ("Ordinarily, we will not take notice of an error that is not preserved unless the error amounts to 'plain error,' Fed.R.Crim.P. 52(b)...."). This court has noted, however, that Rule 404(b) merely describes a particular form of "unfair prejudice" anticipated under Rule 403, and has allowed review of an admission under that rule where not specifically noticed below. *See United States v. Currier,* 836 F.2d 11, 17 (1st Cir. 1987).

any serious financial difficulty. On the other hand, he suggests, the evidence was highly prejudicial. Thus, he claims that the court abused its discretion in admitting it.

We think that the court clearly acted within its discretion. Rule 403 is a liberal rule under which relevant evidence generally is admitted. *See Dente v. Riddell, Inc.,* 664 F.2d 1, 6 (1st Cir.1981). Only when the probative value of the evidence is "substantially outweighed" by unfair prejudice will it be excluded. *See* 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5221 at 309 (1978) ("the purpose of requiring probative worth to be 'substantially outweighed' is to further the policy of favoring the admissibility of evidence"). Here, the evidence of McMahon's financial difficulties clearly tended to make it more likely that he would have sought money from an illegal venture. *See* Fed.R.Evid. 401 (evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence"). Although McMahon had last taken a pay advance some months before the conspiracy began, he had taken them over a period of three years, ending in November 1984, only six months before the alleged extortion. And those advances were not stopped voluntarily; McMahon's employer denied McMahon's last request and advised him that it would no longer make such advances. The fact that McMahon had taken a recent second mortgage was further evidence that he had financial difficulties. Finally, the court allowed evidence that McMahon had been sued for uninsured conduct, placing him, at a minimum, under obligation for legal costs to defend.

It defies common sense to suggest that evidence of a defendant's motive is irrelevant to whether he committed the offense. And this court has held that when evidence goes to show motive, the relevancy hurdle is particularly low. *See United States v. Tierney,* 760 F.2d 382, 387 (1st Cir.1985). Although some unfair prejudice could arise from the possibility that the jury might interpret such information as evidence of poor character, we think that the district court did not abuse its discretion in deciding to admit the information. This is more particularly true in light of the court's careful decision to allow some but not all of the government's evidence about financial condition. The court carefully balanced the probativeness of each piece of evidence and allowed these three items. We see no error.

## C. *Admission of Contents of the Note*

■■■■ McMahon contends that the district court improperly allowed testimony about the contents of a note that he allegedly passed to George Salisbury.[3] McMahon objected on the ground that there was nothing to demonstrate that McMahon was the author of the note, and hence, nothing to show that it was an admission and non-hearsay under Fed.R.Evid. 801(d)(2) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... the party's own statement...."). Under the Federal Rules of Evidence, the authentication of evidence is a condition precedent to its admissibility. *See* Fed.R.Evid. 901(a). In order to authenticate a document under the federal rules, there must be "evidence sufficient to support a finding that the evidence is what the proponent claims it to be...." *United States v. Arboleda,* 929 F.2d 858, 869 (1st Cir.1991) (internal quotations omitted). The determination of whether a proper foundation has been laid for the introduction of evidence lies within the sound discretion of the district court. *United States v. Patterson,* 644 F.2d 890, 900–901 (1st Cir.1981).

McMahon contends on appeal that no adequate basis was offered by the government to support the district court's finding that he authored the note. McMahon rests his argument on the failure of the government's witness, Laurence Belair, to testify that he recognized the handwriting as McMahon's. *See* Fed.R.Evid. 901(b)(2) (allowing authentication by opinion of lay witness as to handwriting).

---

**3.** Laurence Belair testified that the note stated "I need your help to stop the Proko plan. I believe it's within 2,000 feet of another dealer." Trans. of January 11, 1990 at 15.

We reject this conclusion. Rule 901(b)(2) is provided as only one example of a means by which a document may be authenticated, not as a precondition to admissibility in and of itself. *See* Fed.R.Evid. 901(b) (providing "illustrations" of means of authentication or identification, not intended "by way of limitation" to constrain the authentication of a document). In this case, the district court was well within its discretion in determining that there was sufficient evidence to conclude that the document was a party admission. McMahon was observed passing the note. The document repeated nearly verbatim the content of a conversation conducted between McMahon and Salisbury in a "soft tone of voice" and overheard only moments before by a different board member. Salisbury was hard of hearing, so there was some basis for thinking that the conversation needed repeating. The handwritten note twice employed the personal pronoun "I," saying "*I* need your help" and "*I* believe," suggesting in the absence of a signature that the passer of the note was its author. The note described the planned Proko site as within 2,000 feet of another dealership, an issue raised by McMahon later in the meeting. Finally, there was no basis for thinking the note originated with any other author, in part because no one else raised the issue of the 2,000–foot ordinance, and in part because McMahon allegedly passed the note himself and never contended that he merely passed a note authored by another; he instead denied the existence of any note.

This evidence amply supports a reasonable conclusion that the note was written by McMahon, and thus was admissible as a party admission. *See* Fed.R.Evid. 901(b)(4) (evidence may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive character-

istics, taken in conjunction with circumstances"); *United States v. Newton*, 891 F.2d 944, 947 (1st Cir.1991) (document contained sufficient connections to personally known information to be authentic, and therefore was admissible as party admission); *United States v. Ingraham*, 832 F.2d 229, 236 (1st Cir.1987) ("Like a wide array of other phenomena, telephone calls may be authenticated by exclusively circumstantial evidence."). While the jury was entitled to disbelieve the authorship or existence of the document, the note clearly was sufficiently authenticated to be admissible by the district court.[4]

### D. *Sufficiency of the Evidence*

■ McMahon claims that the evidence was insufficient to support his convictions and that the district court improperly denied his motion for judgment of acquittal. This court will uphold a jury's finding of guilty if "*any* reasonable juror 'after viewing the evidence in the light most favorable to the prosecution ... could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Walters*, 904 F.2d 765, 770 (1st Cir.1990) (emphasis in original) (quoting *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir. 1989)). We will not weigh witness credibility and will resolve all credibility issues in favor of the verdict. *See United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir. 1991).

McMahon's argument on this point is substantially a credibility challenge. At trial, Hicks explicitly testified about McMahon's involvement in the entire venture. Regardless of McMahon's view of Hicks' veracity, the jury was entitled to believe, and clearly did believe, Hicks' testimony. Moreover, the government introduced telephone records that show that calls from

---

**4.** McMahon makes one further challenge to the admissibility of the contents of the note not raised below. He contends that the best evidence rule requires that the note itself be admitted in preference to testimony about its content. *See* Fed.R.Evid. 1002 ("To prove the content of a writing, ... the original writing ... is required, except as otherwise provided in these rules or by Act of Congress."). Because there was no objection below, this error is subject to review

only for "plain error" under Fed.R.Crim.P. 52(b). There clearly is no plain error, however, because other evidence of the contents of the document was admissible under Fed.R.Evid. 1004(1) (not requiring original where all originals have been lost or destroyed, unless the proponent lost or destroyed them in bad faith). McMahon does not suggest that the government lost or destroyed the document in bad faith.

Hicks' telephone number to McMahon's telephone number preceded or followed many conversations between Hicks and Proko, a circumstance tending to corroborate Hicks' testimony. In addition, there was evidence from two witnesses that, at the meeting to approve the site, McMahon attempted to recruit Salisbury's help to delay approval of the Proko dealership. Together, this clearly constituted more than enough evidence for the jury to have found McMahon guilty beyond a reasonable doubt both on the extortion count and on the counts of use of a facility in interstate commerce for unlawful activity.

■ There also was ample evidence to support McMahon's convictions on three counts of perjury. McMahon testified to the grand jury that, to the best of his recollection, Hicks never had called him at work before October 1985. Similarly he testified that he did not remember having more than four conversations with Hicks between late May and October 1985, only two of which occurred in late May and early June. Yet Hicks testified to repeated telephone conversations leading up to the June 11 planning board meeting. And telephone records indicated as many as eleven toll calls from Hicks' home to McMahon's place of employment between May 28 and June 12 and nineteen total toll calls between late May and October, thirteen of which were in the two-week period between May 28 and June 12. In addition, while McMahon denied to the grand jury that he had passed a note to George Salisbury at the meeting, this testimony was directly contradicted by Belair's testimony. The jury clearly had sufficient evidence to believe that McMahon had perjured himself before the grand jury in each of these statements.

### III. *Other Claims*

McMahon has raised a variety of errors for the first time on appeal. When a claim of error has not been preserved by proper objection below, this court will review the issue for plain error only. *See* Fed.R. Crim.P. 52(b); *United States v. Faulhaber*, 929 F.2d 16, 19 (1st Cir.1991). "[W]hen addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). The court must determine whether the errors "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Id.* Having reviewed carefully each of defendant's unpreserved claims we conclude that there has been no error, much less an error that undermines the fundamental fairness of the trial as a whole.

Finally, McMahon claims that he was denied the effective assistance of counsel. As we repeatedly have observed, a claim of inadequate representation generally will not be determined on a direct appeal when the claim has not been raised in the district court. *See, e.g., United States v. Hoyos–Medina*, 878 F.2d 21, 22 (1st Cir.1989). Such a rule assures that the trial judge, who is in the best position to evaluate the quality of legal representation, has the opportunity to do so in the first instance. *United States v. Costa*, 890 F.2d 480, 482–83 (1st Cir.1989). While McMahon raised in post-trial motions two of the six putative attorney errors that he now raises on appeal, there has been no evidentiary hearing or decision in the district court on the claim of ineffective assistance of counsel. We therefore will not address the claim in this direct appeal.

*Affirmed.*