USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 98-1450

 VICTOR E. SIMAS,

 Plaintiff, Appellant,

 v.

 FIRST CITIZENS' FEDERAL CREDIT UNION
 AND BARBARA M. W. SILVA,

 Defendants, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert B. Collings, U.S. Magistrate Judge]

 

 Before

 Torruella, Chief Judge,

 Aldrich and Cyr, Senior Circuit Judges,

 

 Philip N. Beauregard, with whom Law Offices of Beauregard & Burkewas on brief for appellant.
 Michael P. Duffy, with whom Harvey Weiner and Peabody & Arnold LLPwere on brief for appellees.

 

 March 2, 1999
 

 CYR, Senior Circuit Judge. Victor E. Simas appeals the
district court judgment which dismissed his complaint charging
First Citizens' Federal Credit Union ("Citizens") and its president
and CEO, Barbara M.W. Silva, with violating the "whistleblower"
provisions of the Federal Credit Union Act, 12 U.S.C. 1790b(a)
(FCUA or "the Act"), by retaliating against him for having informed
the National Credit Union Administration ("NCUA") that Citizens,
notwithstanding its longstanding policy, had made a suspect
commercial loan to a member of its board of directors. We vacate
the district court judgment and remand for further proceedings.
 I
 BACKGROUND
 The district court opinion thoroughly explicates the
factual background underlying the present claim. See Simas v.
First Citizens' Fed. Credit Union, 996 F. Supp. 76 (D. Mass. 1998). 
Accordingly, we restrict our opening recitation to the essentials. 
 At all relevant times, Simas was a vice-president under
Silva's supervision, with primary responsibility for all delinquent
loan collections. In September 1993, Simas learned that Silva's
friend, Louis Xifiras, was about to default on an undersecured
commercial loan with an outstanding balance approximating $831,000. 
Simas considered the circumstances surrounding the 1990 loan to
Xifiras suspicious. For one thing, Silva herself had arranged the
loan, the largest in Citizens' history, even though Xifiras was
serving on the Citizens board of directors at the time and intended
to use the proceeds to acquire commercial real estate. Citizens
had a longstanding policy against making commercial loans. 
Moreover, several Board members expressed concern that the
$1,030,000 real estate appraisal, prepared by an appraiser selected
by Xifiras, was inflated. Furthermore, Xifiras and Lisa Grace,
Silva's daughter and Citizens' senior vice-president for mortgage
loans, were rumored to be involved in an extramarital affair. 
Finally, Ms. Grace personally presented the Xifiras loan
application for Board approval.
 Simas alerted Silva to his concerns, then asked Citizens'
internal auditor to conduct an investigation. The auditor
declined. When Simas persisted, the auditor complained to Silva. 
Simas thereafter informed the auditor that if she chose not to
investigate internally, he might be forced to report his concerns
to the NCUA or the press.
 In October 1993, Silva sent Simas a memorandum advising
that his repeated "irrational" and "aggressive" verbal harangues
about the Xifiras loan were causing the internal auditor "emotional
distress." She characterized Simas' announced intention to contact
the NCUA or the press as "threats to the credit union," and his
concerns about the Xifiras loan as totally unwarranted. She
suggested that Simas was making trouble because he was unhappy with
his own working conditions and she explicitly warned that he would
be terminated immediately if the "verbal harassments [or]
unwarranted charges or threats" occurred again. Shortly
thereafter, Silva removed Simas from all responsibility for the
Xifiras loan. Following this "final warning" from Silva, Simas was
informed by Citizens' senior vice-president that he believed Silva
should have fired Simas for "stirring [up]" the Xifiras matter.
 After Xifiras defaulted on the Citizens loan and declared
bankruptcy, the commercial real estate securing the loan was
appraised at $538,000. As required by law, Silva reported the loss
to the NCUA. Fearing for his job in the event he chose to pursue
the Xifiras matter internally, Simas promptly reported his concerns
to the FBI and NCUA.
 Thereafter, Simas "experienced an abrupt and substantial
change in the way that he was treated by [Citizens]." Coworkers
shunned him, socially and professionally. Citizens disapproved his
car loan application for the first time ever. Although Citizens
ultimately approved his education loan application, it did so over
Silva's active opposition. Simas was stripped of many work-related
privileges consistently accorded him in the past; including (1)
attending board of directors meetings, (2) supervising employees in
the credit department, (3) approving credit-card applications, (4)
personal access to the file vault, and (5) serving as Citizens'
acting president in Silva's absence. Silva also refused to
consider Simas' request for promotion to a vacant vice-presidency,
removed him as network administrator, denied him permission to
attend a business-related seminar, and refused his request for a
cellular phone. These adverse employment actions were
unprecedented.
 In January 1994, the NCUA conducted its annual audit of
Citizens, devoting an "unusual" amount of time to consultations
with Simas. Its audit report noted "the presence of adverse
conditions and trends [which] [i]f left unresolved . . . will
jeopardize the financial condition and/or operations of
[Citizens]." The NCUA found that the Xifiras loan had been made
"without the support of a comprehensive written Member Business
Loan program" and that it was improperly preferential in its terms
and conditions to a compensated member of the board of directors. 
The NCUA cited Citizens for allowing Xifiras to engage his own
appraiser, directed Citizens to cease making business loans to its
members, and ordered that it notify its surety bond carrier of all
regulatory violations. Citizens' board of directors accepted the
NCUA report. Thereafter, the NCUA requested that several Citizens'
directors resign, including Silva.
 In March 1994, Citizens' new internal auditor recommended
that Simas start looking for another job. After locating a lesser
paying job at another bank, on May 2 Simas submitted his
resignation to Citizens, effective May 13. Silva, however, made
the resignation effective immediately, and directed that Simas be
escorted from the credit union premises in full view of his
coworkers, several of whom questioned him about the reason for the
unprecedented treatment. In reporting Simas' accelerated
"resignation" to the NCUA, Silva characterized Simas as "a
disgruntled employee" with access to confidential information. 
Later, she defined the term "disgruntled employee" as including one
who might come into work and shoot his fellow workers. 
 In due course Simas brought suit against Citizens and
Silva in federal district court, alleging violations of the FCUA
"whistleblower" provisions, see 12 U.S.C. 1790b(a), together with
several pendent state-law claims, including wrongful termination,
defamation, and tortious interference with an advantageous
relationship. Following discovery, both defendants moved for
summary judgment on all claims. 
 The district court granted summary judgment on the FCUA
claim, concluding that Simas had not generated a trialworthy
dispute as to whether the treatment accorded him after September
1993 was sufficiently adverse to constitute either a "constructive
discharge" or "discriminat[ion] . . . with respect to compensation,
terms, conditions, or privileges of employment," within the meaning
of section 1790b(a). Finally, the pendent state-law claims were
dismissed for lack of supplemental jurisdiction. See 28 U.S.C. 
1367(c)(3).
 II
DISCUSSION
A. The Statutory Framework
 One of several federal "whistleblower" statutes, the FCUA
provides in pertinent part:
 No insured credit union may discharge or
 otherwise discriminate against any employee
 with respect to compensation, terms,
 conditions, or privileges of employment
 because the employee (or any person acting
 pursuant to the request of the employee)
 provided information to the [National Credit
 Union] Board or the Attorney General regarding
 any possible violation of any law or
 regulation by the credit union or any
 director, officer, or employee of the credit
 union.

12 U.S.C. 1790b(a)(1). Should a federal credit union violate
section 1790b, the aggrieved employee may bring suit for
compensatory damages and "other appropriate actions to remedy any
past discrimination." Id. 1790b(c).
 In according safeguards against retaliation to credit
union employees who report potential irregularities, Congress
intended to "enhance the regulatory enforcement powers of the
depository institution regulatory agencies to protect against
fraud, waste and insider abuse." H.R. Rep. No. 101-54(I), at 308
(1989), reprinted in 1989 U.S.C.C.A.N. 86, 103-04. Since the case
law interpreting section 1790b itself is extremely sparse, however,
the courts have looked to case law construing comparably-phrased
anti-retaliation provisions in other federal employment-
discrimination statutes, such as Title VII, 42 U.S.C. 2000e etseq., the Americans with Disabilities Act (ADA), id. 12101 etseq., and the Age Discrimination in Employment Act (ADEA), 29
U.S.C. 621 et seq., as well as other federal whistleblower
statutes, such as the False Claims Act (FCA), 31 U.S.C. 3730(h),
the Safety Transportation Assistance Act (STAA), 49 U.S.C. 
31105(a)(1)(A), and FIRREA 1831j(a)(1) (providing 1790b-type
coverage to employees of all "insured depository institutions"
"with respect to . . . the terms, conditions, or privileges of
employment"). We follow their lead. See Larou v. Ridlon, 98 F.3d
659, 663 n.6 (1st Cir. 1996).
B. Burdens of Proof
 Many of these federal anti-retaliation statutes require
the claimant to make a three-part prima facie showing that: (1)
the claimant engaged in the protected activity (e.g., filed a
complaint or reported information to the government); (2) the
defendants subjected the claimant to some materially adverse
employment action, and (3) a causal connection existed between the
protected activity and the adverse action. Cf. BSP Trans, Inc. v.
United States Dep't of Labor, 160 F.3d 38, 46 (1st Cir. 1998) (STAA
whistleblower provision); Hernandez-Torres v. Intercontinental
Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (Title VII
retaliation); Hodgens v. General Dynamics Corp., 144 F.3d 151, 161
(1st Cir. 1998) (Family and Medical Leave Act). Even under these
analogous statutes, however, "[t]he [claimant's] initial burden to
establish a prima facie case of discrimination is 'not onerous' .
. . [and] '[a]ll that is needed is the production of admissible
evidence which, if uncontradicted, would justify a legal conclusion
of discrimination.'" Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21,
26 (1st Cir. 1998) (emphasis added; citation omitted); see alsoTexas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54
(1981). 
 Under yet other anti-retaliation statutes, moreover, the
claimant's prima facie burden on the third or "causation" element
is further eased, so as to require only a showing that the
protected activity was a "contributing factor" in the adverse
action, not necessarily its substantial or motivating cause. SeeFrobose v. American Sav. and Loan Ass'n of Danville, 152 F.3d 602,
612 (7th Cir. 1998) (FIRREA 1831j(a)(1)). Indeed, Citizens and
Silva acceded to the latter prima facie standard below, see Simas,
996 F. Supp. at 86, and we accept their concession in addressing
the merits on appeal. See, e.g., Clean Harbors Envtl. Servs., Inc.v. Herman, 146 F.3d 12, 22 (1st Cir. 1998) ("Both parties have
accepted this [allocation of the BOP] as the standard and we do not
reexamine it.").
 Once the claimant makes a prima facie showing, a
presumption of retaliation arises and the burden shifts to the
defendants. With respect to the former category of anti-
retaliation statutes, see supra Section II.B, 1, only the burden
of production passes to defendants, i.e., requiring them merely to
articulate ÄÄ not prove ÄÄ a nondiscriminatory motive for their
actions. See Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling
Co., 152 F.3d 17, 24 (1st Cir. 1998); Clean Harbors, 146 F.3d at
21-22 (STAA). Once defendants meet their minimal burden of
production, the initial presumption of retaliatory motivation is
removed from the calculus, and the claimant must bear the burden of
proving that the nondiscriminatory motive articulated by defendants
is pretextual and the real motive was the claimant's decision to
exercise the "whistleblower" rights endorsed by the applicable
statute. See Hazel v. United States Postmaster Gen., 7 F.3d 1, 3
(1st Cir. 1993). 
 Under the latter variety of anti-retaliation statute,
however, see supra Section II.B, 2, the entire burden of
persuasion passes to defendants, who must then adduce clear andconvincing evidence that the alleged adverse actions would have
been taken regardless whether the claimant had engaged in the
protected whistleblower activity. See Frobose, 152 F.3d at 612
(FIRREA 1831j(a)); see also infra note 8. Unlike section
1831j(a), however, section 1790b contains no explicit burden-of-
proof allocation. Nevertheless, these defendants acceded below to
the more plaintiff-friendly burden-shifting paradigm utilized under
section 1831j(a), see Simas, 996 F. Supp. at 86, which thereby
became the law of the case. See Clean Harbors, 146 F.3d at 22.
C. Summary Judgment Rulings
 1. Defendants' Knowledge of the NCUA Contacts by Simas
 The summary judgment motion submitted by Silva and
Citizens asserted two grounds for dismissing the FCUA claim;
namely, that Simas failed to adduce competent evidence from which
a jury rationally might infer that (1) defendants were aware of
Simas' contacts with the NCUA prior to his resignation; and (2)
their adverse employment actions were consequential enough to
constitute either a "constructive discharge" or "discrimination."
 Silva unambiguously attested that she could not have
retaliated against Silva for contacting the NCUA, because she never
knew whether he had carried out his threat to do so until after he
had submitted his resignation on May 2, 1994. See, e.g., Lewis v.
Gillette, Co., 22 F.3d 22, 24 (1st Cir. 1994) (noting that claimant
normally cannot establish the requisite causal connection without
establishing that "the alleged retaliators knew of the protected
plaintiff's activity"). After defendants filed their summary
judgment motion, Simas promptly filed a motion for continuance,
pursuant to Fed. R. Civ. P. 56(f), in which his counsel asserted
that he recently learned from a "highly reliable source" that
Michael DeBarros, formerly a Citizens senior vice-president and
CFO, had overheard Silva declare in early 1994 that she believed it
was Simas who had prompted the NCUA auditor to take such a special
interest in the Xifiras loan. Simas' counsel then contacted
DeBarros' counsel, who refused to allow his client to file an
affidavit out of fear that "Silva might attempt to retaliate
against [DeBarros]." Nonetheless, DeBarros' counsel indicated that
DeBarros would submit to a deposition under subpoena. 
 The district court bypassed the question whether Simas
had adduced sufficient evidence as to Silva's knowledge. Instead,
it rested its grant of summary judgment for defendants on the
independent ground that Simas had not adduced enough evidence of a
constructive discharge or sufficiently "adverse employment
actions." Thus, the district court denied the Rule 56(f) motion as
moot. On appeal, however, defendants urge us to affirm on this
alternative ground. See Sammartano v. Palmas del Mar Properties,
Inc., 161 F.3d 96, 97 n.2 (1st Cir. 1998) (appellate court may
affirm summary judgment on any ground apparent in the record). We
now address the infirmities in their present position.
 First, despite Silva's attestations to the contrary, we
seriously question whether Simas needed the DeBarros testimony to
survive summary judgment. After all, there is no dispute that
Silva knew by the fall of 1993 that Simas had threatened to contact
the NCUA, see supra Section I, 3, and since there is no evidence
that any other Citizens employee ever made such a threat, the
January 1994 targeted audit of the Xifiras loan documents was a
good deal more than a subtle hint that Simas must have alerted the
NCUA. Thus, even absent the DeBarros deposition a jury would not
have been compelled to conclude that Silva was unaware that Simas
was the likely "whistleblower." See Perez-Trujillo v. Volvo Car
Corp. (Sweden), 137 F.3d 50, 54 (1st Cir. 1998) (court cannot
resolve genuine credibility issues at summary judgment).
 Furthermore, the summary judgment record discloses no
principled ground which would preclude the reasonable possibility
that the DeBarros deposition would bear the expected fruit. 
Defendants argue, without citation to authority, that Simas' Rule
56(f) motion was defective because he relied on inadmissible
hearsay (e.g., the unnamed "highly reliable source") rather than
his personal knowledge to conclude that DeBarros could provide
the damaging evidence. Their argument fundamentally confuses Rule
56(f)'s requirements with those in Rule 56(e) ("Supporting
affidavits . . . shall set forth such facts as would be admissible
in evidence . . . .").
 "[A] Rule 56(f) proffer need not be presented in a form
suitable for admission as evidence at trial, so long as it rises
sufficiently above mere speculation." Resolution Trust Corp. v.
North Bridge Assocs., 22 F.3d 1198, 1206 (1st Cir. 1994) (citing
Carney v. United States, 19 F.3d 807, 813 (2d Cir. 1994)). "This is
as it should be, for Rule 56(f) is best understood as a complement
to other provisions contained in Rule 56, allowing the opposing
party to explain why he is as of yet unable to file a full-fledged
opposition, subject to the more harrowing evidentiary standard that
governs under Rules 56(e) and 56(c)." Id. at 1206-07. Thus,
reliance on hearsay is not, per se, a dispositive defect under Rule
56(f). 
 Furthermore, the Rule 56(f) motion filed by Simas did not
rely exclusively on the information provided by the unnamed source,
but also on the personal knowledge counsel had gained in subsequent
consultations with DeBarros' counsel, who confirmed that DeBarros
feared retaliation were he to testify against Silva. The latter
evidence would provide rational support for Simas' counsel's
suspicion that the DeBarros testimony would prove damaging to
Silva. See id. at 1207 (finding Rule 56(f) motion valid where
multiple sources supported recited facts).
 On the present record, therefore, Simas appears to have
satisfied all five preconditions for obtaining a Rule 56(f)
continuance. See supra note 4. "When all five requirements are
satisfied . . . a strong presumption arises in favor of relief . .
. [and the movant] should be treated liberally." Id. at 1203.
Thus, since the district court never resolved the Rule 56(f) motion
on the merits, we cannot affirm its summary judgment ruling on the
alternative ground suggested by defendants.
 2. The Adverse Employment Actions
 a) Constructive Discharge
 The FCUA prohibits a federal credit union from engaging
in two distinct types of retaliatory employment action: (1) an
actual or constructive "discharge"; or (2) other "discriminat[ion]
. . . with respect to compensation, terms, conditions, or
privileges of employment" short of discharge, or what we have
sometimes labeled "adverse employment actions." See 12 U.S.C. 
1790b(a)(1). The complaint alleged that Citizens constructively
discharged Simas, which necessitated that he show that Citizens
imposed "working conditions so intolerable [] that a reasonable
person would feel compelled to forsake his job rather than to
submit to looming indignities." Vega v. Kodak Caribbean, Ltd., 3
F.3d 476, 480 (1st Cir. 1993); see also Sanchez v. Puerto Rico Oil
Co., 37 F.3d 712, 719 (1st Cir. 1994). 
 The district court concluded, however, that the various
"indignities" to which Simas had been subjected were "nothing more
than minor slights," Simas, 996 F. Supp. at 83, which did not rise
to the level of "constructive discharge." It suggested further
that the Simas complaint alleged only a constructive discharge, and
no other adverse employment actions. See id. at 84 (citing
Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 28 (1st Cir.
1997)). It stated that, like the plaintiff in Serrano, Simas had
merely alleged damages for "loss of income and employment benefits,
loss of personal reputation, and other financial losses . . . and
little, if anything, else," id. (citing Complaint 32) (emphasis
added), and, further, that these economic damages flowed
exclusively from Simas' decision to leave his job, rather than from
defendants' imposition of adverse working conditions in the months
preceding his resignation.
 Even assuming arguendo the premise that the constructive
discharge standard under the FCUA would require proof of more
intolerable employment actions than its "discrimination" standard,
we need not determine whether the Rule 56 proffer established a
prime facie case of constructive discharge since Simas
unquestionably alleged "adverse employment actions" as well. Seeinfra Section II.C.2(b). Thus, Serrano-Cruz is inapposite, both
legally and factually.
 Unlike Simas, Serrano resigned rather than accept
transfer to a different position at the same salary which she
considered demeaning. We affirmed summary judgment for the former
employer because, "by not accepting the newly created and ambiguous
position, Serrano foreclosed the possibility of presenting concrete
evidence, rather than mere assertions, to a jury regarding the
[intolerable] nature of her new working conditions." Serrano-Cruz,
109 F.3d at 27. In determining that Serrano had failed to frame
her complaint alternatively to allege actionable "adverse
employment actions" short of discharge, we noted that all the
damages she alleged were purely economic e.g., lost income 
flowing entirely from her decision to reject the transfer and
resign, and not from other indignities (i.e., gradual reduction in
her job responsibilities) allegedly suffered in the months
preceding the transfer. Id. at 28.
 By contrast, the Simas resignation did not foreclose
judicial assessment of the adverse working conditions allegedly
imposed by Citizens, most of which preceded his resignation. Nor
can we agree with Citizens that Simas alleged "little" more than
economic damages. Paragraph 32 in the complaint, cited by the
district court, alleged "loss of income and employment benefits,
loss of personal reputation, other financial losses, and mental and
emotional distress." (Emphasis added.) Moreover, although
paragraph 32 is part of the defamation count, and not the FCUA
count proper, paragraph 36 of the FCUA count expressly realleges
and incorporates paragraph 32 by reference. See also Complaint
Prefatory 21 (alleging that Simas "was the object of anger and
scorn from his superiors, and he was suffering emotionally and
physically as a result") (emphasis added).
 Thus, the Simas complaint alleged ongoing emotional
damages of a type that arose at the time the defendants imposed the
adverse employment actions and long before he resigned, culminating
in his humiliating exit from the employment premises under the
personal escort ordered by Silva. See Viqueira v. First Bank, 140
F.3d 12, 16 (1st Cir. 1998) (noting that complaints are to be
liberally construed). These noneconomic damages are fully and
independently recoverable under the FCUA. See 12 U.S.C. 
1790b(c)(2) (broadly allowing plaintiff to recover "compensatory
damages"); cf. Hogan v. Bangor and Aroostook R.R. Co., 61 F.3d
1034, 1037 (1st Cir. 1995) (emotional harm compensable under ADA). 
Thus, we may bypass the constructive discharge claim.
 b) "Adverse Employment Actions"
 We now turn to the sufficiency of the Rule 56 proffer,
wherein Simas attested to an extended series of "abrupt and
substantial change[s] in the way he was treated as an employee"
after he first expressed concerns regarding the Xifiras loan. Seesupra Section I.
 At summary judgment the trial court must consider a
defendant's alleged conduct both in context and in totality, not
merely assess the respective allegations in isolation. See Calhounv. Acme Cleveland Corp., 798 F.2d 559, 562-63 (1st Cir. 1986)
(rejecting "divide-and-conquer" defense strategy); see also Coffmanv. Tracker Marine, 141 F.3d 1241, 1246 (8th Cir. 1998) ("[The]
court looks at the combined effect of the employer's actions to
determine if there was discrimination") (emphasis added; citation
omitted). Thus, otherwise minor slights, relentlessly compounded,
may become sufficiently "adverse" to warrant relief under the FCUA. 
 At the outset we focus on an important consideration 
given short shrift by defendants which sharply distinguishes the
present action from the more typical retaliation case. Normally,
employers do not leave behind direct evidence of their
discriminatory animus, such as express declarations of their
retaliatory intentions. Therefore, generally the plaintiff-
employee must make do with circumstantial evidence, leaving it to
the jury whether to infer from the nature of the materially adverse
employment conditions that the defendant-employer harbored a
retaliatory animus.
 In the present case, however, Simas adduced both
circumstantial and direct evidence of Silva's retaliatory animus. 
In her October 8, 1993 memo, Silva not only complained that Simas
had harassed the internal auditor, but stated directly to Simas
that the charges he made about the Xifiras loan were "unwarranted,"
and that if he persisted in making "unwarranted charges or threats
[to report his suspicions to the NCUA]," he would be terminated
immediately. So too, Citizens' senior vice-president told Simas
that he thought Silva should have fired Simas outright for
"stirring [up]" the Xifiras matter. See, e.g., Frobose, 152 F.3d at
616 (affirming denial of summary judgment for employer in 1831j
retaliation case where president's express antagonism toward
plaintiff was echoed in antagonistic remarks made by other senior
officers).
 The term "making unsubstantiated charges," as employed in
the Silva memo, is amply expansive to encompass Simas' report to
the NCUA, and Silva's express intention to terminate Simas likewise
bespeaks a premeditated plan to punish him for the same activity. 
Given that Silva orchestrated the loan for her friend Xifiras in
the first instance, and that the concerns Simas voiced about the
loan eventually proved anything but "unwarranted," a jury
reasonably could conclude that the sole intendment of her October
8 memo was to prevent Silva's regulatory violations from coming to
the attention of the appropriate federal authorities.
 So construed, these direct retaliatory expressions by
Silva could be considered materially adverse employment actions
which sufficed to preclude summary judgment for defendants. SeeHernandez-Torres, 158 F.3d at 47 ("adverse employment actions [may
include] . . . unwarranted negative job evaluations").
 Section 1790b prohibits discrimination relating to
"conditions" of employment. Although the term "conditions" may
mean merely the physical setting in which one's work is performed,
(e.g., reassignment to a remote cubicle), it is not so limited in
scope as to exclude illicit supervisory directives conditioning
continued employment upon prohibitions against employee conduct
which is authorized by federal laws governing employer-employee
relations. Thus, the explicit direction from Silva that Simas
refrain from exercising his federal legal right to contact the NCUA
clearly came within section 1790b.
 If nothing else, Congress intended that section 1790b
deter federal credit unions from expressly dissuading their
employees in exercising the statutory right to report suspected
regulatory violations. In our case, it is no exaggeration to
observe that the "not-so-veiled" threat made by Silva, which by its
terms was self-perpetuating, hung like a sword of Damocles over
Simas' head. Moreover, pursuit of the Xifiras loan investigation
by Simas was in no sense ultra vires, since it is difficult to
conceive a "condition" more materially adverse to the proper
performance of the fiduciary duties of the senior vice-president
for loan collections.
 At this juncture, of course, we do not suggest that a
jury would be compelled to construe this direct evidence adversely
to defendants, who presumably would contend that (i) Silva truly
believed the Xifiras loan was not problematic, (ii) Simas raised
his concerns in bad faith because he was disgruntled with what he
perceived as Silva's preferential treatment of her daughter to the
detriment of other Citizens officers; and (iii) Silva's memo sought
only to urge Simas to cease his overly aggressive efforts to
initiate an internal investigation, and keep any intentions to
contact the NCUA to himself.
 Be that as it may, any such credibility determinations
are for the factfinder at trial, not for the court at summary
judgment. Perez-Trujillo, 137 F.3d at 53. "[T]rial courts should
'use restraint in granting summary judgment' where discriminatory
animus is in issue." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st
Cir. 1997) (citation omitted).
 Further, given defendants' concessions regarding the
allocation of burdens of proof, see supra Section II.B, the Silva
memo would support a finding that whatever other motives Silva may
have harbored (e.g., her pique at Silva's alleged badgering of the
internal auditor), a retaliatory motivation was at least one
"contributing factor" in her campaign to oust or silence Simas. 
Thus, the burden of persuasion would pass to the defendants to
adduce clear and convincing evidence that they would have engaged
in the same litany of alleged employment actions even if Simas had
not contacted the NCUA. See Frobose, 152 F.3d at 615 ("Given that
the burden of proof on this point is assigned to the defendant, and
questions of intent and credibility will often be raised,
particular care must be taken to resolve all doubts in favor of the
plaintiff.")(emphasis added; citations omitted).
 In all events it is unnecessary to determine definitively
whether the direct evidence, standing alone, demonstrated a
materially adverse employment action. At a minimum the direct
evidence necessarily colors and informs the circumstantial evidence
of the adverse employment action which followed. "'[T]erms,
conditions, or privileges' is pretty open-ended language . . .
[which] obviously includes opportunities that are not strictly
entitlements, and a number of cases have extended coverage to
slights or indignities that might seem evanescent." Randlett v.
Shalala, 118 F.3d 857, 862 (1st Cir. 1997). "Typically, the
employer must either (1) take something of consequence from the
employee, say, by discharging or demoting her, reducing her salary,
or divesting her of significant responsibilities, or (2) withhold
from the employee an accouterment of the employment relationship,
say, by failing to follow a customary practice of considering her
for promotion after a particular period of service." Blackie v.
State of Maine, 75 F.3d 716, 725 (1st Cir. 1996). "Determining
whether an action is materially adverse necessarily requires a
case-by-case inquiry. Moreover, the inquiry must be cast in
objective terms. Work places are rarely idyllic retreats, and the
mere fact that an employee is displeased by an employer's act or
omission does not elevate that act or omission to the level of a
materially adverse employment action." Id. (emphasis added;
citations omitted).
 Our review leads us to conclude that these employment
actions, viewed in aggregate, could be considered "materially
adverse." The fact that Citizens did not reduce Simas' salary or
benefits, though plainly relevant, is not conclusive. See Serrano-
Cruz, 109 F.3d at 26 (ADEA); Collins v. State of Illinois, 830 F.2d
692, 702-03 (7th Cir. 1987) (Title VII).
 The district court overlooked the crucial, undisputed
fact that Silva withdrew from Simas all responsibility for the
Xifiras account. See Burlington Indus. v. Ellerth, 118 S. Ct.
2257, 2268 (1998) (conduct is adverse employment action if it
"constitutes a significant change in employment status, such as .
. . reassignment with significantly different responsibilities");
Collins, 830 F.2d at 703 & n.7 (describing various changes to basic
aspects of the job). As the vice-president for collections and
credit, Simas' core responsibility was to collect delinquent loans,
and the $838,000 Xifiras loan was by far the largest Citizens
loan. Thus, Simas clearly was not acting ultra vires in
investigating the Xifiras loan. Rather, there can be no serious
question that removing Citizens' chief loan and collection officer
from any responsibility whatever for its largest outstanding loan
represented a very substantial divestment of responsibility. Thus,
since the FCUA implicitly focuses on individuals like Simas ÄÄ
insiders with an optimal opportunity to uncover improprieties ÄÄ it
would be ironic to hold that a jury could not even consider whether
Silva's decision to take the Xifiras loan account away from Simas
constituted an adverse employment action. 
 There was evidence that Simas had been divested of other
responsibilities and perquisites as well. For example, Simas
attested that he had been stripped of his supervisory authority
over credit department personnel and the power to approve credit-
card applications. See Dahm v. Flynn, 60 F.3d 253, 258-59 (7th
Cir. 1994) (noting that "terminating [plaintiff's] supervisory
authority over other employees" may constitute an adverse
employment action) (First Amendment retaliation). Yet the district
court found this evidence too vague and conclusory to survive
summary judgment because Simas "proffer[ed] no facts to explain the
extent of his prior authority and the significance of the
'removal.'" Simas, 996 F. Supp. at 85. We cannot agree.
 It is axiomatic on summary judgment, of course, that "the
nonmoving party 'may not rest upon mere allegation or denials of
[the movant's] pleading, but must set forth specific facts showing
that there is a genuine issue' of material fact as to each issue
upon which he would bear the ultimate burden of proof at trial."
DeNovellis, 124 F.3d at 306 (quoting Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 256 (1986)); Smith v. Stratus Computer, Inc.,
40 F.3d 11, 12-13 (1st Cir. 1994). Nor may the court accept the
nonmovant's subjective characterizations of events, unless the
underlying events themselves are revealed. See Santiago v. Canon
U.S.A., Inc., 138 F.3d 1, 6 (1st Cir. 1998). On the other hand,
the competence of the nonmovant's own testimony is treated no
differently than that of any other potential trial witness. Thus,
the nonmovant's statements normally pass muster provided they (1)
are made "on personal knowledge" of the facts or events described;
and (2) neither depend on inadmissible hearsay nor (3) purport "to
examine the [movants'] thoughts as well as their actions." See,
e.g., Maiorana v. MacDonald, 596 F.2d 1072, 1079-80 (1st Cir.
1979); see also Fed. R. Civ. P. 56(e).
 Although pithy, the attestations made by Simas adverted
to such facts and events. Simas undoubtedly would have direct
personal knowledge of his own job functions, including whether he
had exercised authority over credit department personnel and
approved credit-card applications in the past. Therefore, his
attestations are statements of fact, not subjective
characterizations. Thus, while the defendants may present evidence
contesting their truth, to the extent they do so they simply
preclude summary judgment for either party. See Brennan, 150 F.3d
at 26 (plaintiff's prima facie burden is "'not onerous' . . . [and]
'[a]ll that is needed is the production of admissible evidence
which, if uncontradicted, would justify a legal conclusion of
discrimination.'") (emphasis added). Nor can we say that no
rational jury could conclude that these two privileges were
consequential, if for no other reason than defendants' own
concession that Simas' official job title was vice-president of
collections and credit. DeNovellis, 124 F.3d at 308 ("'[A]t the
summary judgment stage the judge's function is not . . . to weigh
the evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial.'").
 In a similar vein the district court ruled that the
contention that Simas had been denied a car loan could not
demonstrate an adverse employment action. Simas, 996 F. Supp. at
83. Defendants argue that (1) they have no record of the loan
application and Simas failed to adduce a copy; and (2) Simas failed
to attest to facts demonstrating that he was otherwise qualified to
receive a car loan. Neither argument is valid. 
 First, "there is no general rule that proof of a fact
will be excluded unless its proponent furnishes the best evidence
in his power." See Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1543
(11th Cir. 1994) (citation omitted). Thus, Simas can prove he
filed a loan application simply through his own trial testimony. 
See Fed. R. Evid. 1002 ("To prove the content of a writing, . . .
the original writing ... is required, except as otherwise provided
in these rules or by Act of Congress.") (emphasis added); Fed. R.
Evid. 1004(1) (original document need not be produced if the
original was lost or destroyed, except where party opposing
admission proves the proponent lost or destroyed the original in
bad faith); Fed. R. Evid. 1004(3) (original need not be produced if
it was under the control of the party against whom it was offered,
which did not produce it at hearing); see also United States v.
McMahon, 938 F.2d 1501, 1509 n.4 (1st Cir. 1991).
 Second, Simas attested to the fact that Citizens had
always approved his loan applications in the past, without
objection. At least absent evidence that his financial condition
had changed, this constituted competent evidence that Citizens
considered Simas financially qualified to receive such loans. SeeBlackie, 75 F.3d at 726 ("[U]nder certain circumstances an
employer's inaction can operate to deprive an employee of a
privilege of employment that an employee had reason to anticipate
he would receive."). Hence, Simas met his prima facie burden of
proof, and the burden of persuasion thereupon shifted to defendants
to show the true reason for the loan denial. Finally, we cannot
say that the denial of a car loan must be considered
inconsequential per se.
 Simas likewise attested that he was denied unfettered
access to the file vault. The only rejoinder from defendants is
that Citizens banned all officers, not only Simas, from accessing
the vault, and that Simas was permitted to obtain any file he
wanted through a vault clerk. These claims are flawed as well.
 For one thing, Simas was only required to attest that the
new vault-access procedure was materially adverse. As vice-
president in charge of collections, his need for vault access was
evident. Moreover, in light of Silva's October 8 memo, a jury
reasonably could find the timing of the new procedure especially
suspect, since it interposed a vault clerk between Simas and
important bank documents at precisely the time Silva sought to
deter any further investigation of the Xifiras loan by Simas. 
Requiring Simas to make a request for a specific document from a
vault clerk clearly had two adverse effects: (1) Simas could not
anonymously examine documents in the vault; and (2) Silva could
learn from the vault clerk precisely which files Simas was
examining. Although Silva explained: "We were having a problem
with the vault[,] of officers going into the vault, and pulling
files and never being replaced[,]" her decision to make the new
vault-access procedure applicable to all bank officers does not
preclude a finding that she harbored an illicit motive in doing so;
that is, to reduce access to information by Simas. Thus, the
burden of persuasion would pass to defendants to show by clear and
convincing evidence that the new vault-access procedure was
necessary for reasons independent of Simas' threats to alert the
NCUA. 
 Finally, although the evidence of yet other adverse
employment actions may be less compelling, it is not so obviously
makeweight as to compel inferences in defendants' favor. Since
we are required to assess defendants' conduct in context and in
totality, rather than piecemeal, see Calhoun, 798 F.2d at 562-63;
Coffman, 141 F.3d at 1246, we conclude that summary judgment on the
FCUA claim was improvidently granted, and must be vacated. The
state-law claims for defamation, wrongful termination, and tortious
interference with an advantageous relationship must be reinstated
as well, since the district court dismissed them solely for lack of
supplemental jurisdiction. See Alexis v. McDonald's Restaurants of
Mass., Inc., 67 F.3d 341, 354 (1st Cir. 1995) (remand on state-law
claims warranted where federal claim is reinstated).
 The district court judgment is vacated and the case is
remanded for further proceedings consistent with this opinion. 
Costs are awarded to appellant.
 SO ORDERED.
 * Concurring Opinion Follows *
 ALDRICH, Senior Circuit Judge, concurring. Judge Cyr's
opinion, which I entirely accept, reads very persuasively. So,
however, does the district court's. In choosing to go along with
the later one, I note several matters. To begin, whistleblowers
face many obstacles. In the first place, they face those whom they
charge, and the higher up those persons, the more difficult they
are to meet. In the second place, whistleblowers face others who,
if not directly concerned, know on which side their bread is
buttered. These obstacles must always be remembered. It must also
be remembered that whistleblowers are Congressionally approved,
rather than everybody's enemy.
 Next, it is to be noted that there is an odor pervading
this case. Consider the exceptional, indeed unique, size of the
loan; the way it was granted, particularly the selection of the
appraiser; and the relationship of the parties in interest,
specifically, the fact that the borrower sat on the credit union's
board of directors at the time and was allegedly involved in an
extramarital affair with its senior vice-president for mortgage
loans. Consider also, at least in passing, the amount that the
collateral proved to be below the indebtedness, not to mention the
required excess. This all produced a substantial odor that cannot
be made to disappear simply by attacks that may be voiced against
the plaintiff individually. With all this in mind, I note that this is summary
judgment.